MARY A. ARMENT v. JAMES W. ARMENT, Appellant.

**Divorce:** DESERTION: EVIDENCE. Where a husband has deserted his wife for the statutory period she is entitled to a divorce on that ground, unless during such period he has in good faith invited her to return without imposing any improper qualifications or conditions. In this action the evidence is reviewed and held sufficient to show that the defendant deserted plaintiff by compelling her to leave home.

**Same:** CONDITIONAL OFFER OF COHABITATION. The offer of a husband to renew cohabitation with his wife whom he has deserted, on condition that she desist from offering her counsel in their mutual business affairs, will not interrupt the running of the statutory period of desertion.

**Same:** ALIMONY. In this case there were five minor children and the custody of the youngest daughter and son was awarded the plaintiff. The defendant was worth from $20,000 to $25,000 and plaintiff was given $500 temporary alimony and $7500 permanent alimony. *Held,* on appeal that the permanent alimony should be reduced to $5000.

**Same:** TEMPORARY ALIMONY: EFFECT OF REMARRIAGE. The fact that pending the appeal in this case the plaintiff married another did not deprive her of the right to the temporary alimony awarded.

*Appeal from Tama District Court.*—HON. J. M. PARKER, Judge.

THURSDAY, FEBRUARY 15, 1912.

SUIT for a divorce and alimony. Judgment for the plaintiff. The defendant appeals.—*Modified* and *affirmed.*

*J. R. Caldwell,* for appellant.

*Struble & Stiger* and *S. C. Huber,* for appellee.

SHERWIN, J.—The plaintiff asks a divorce from the defendant and alimony, on the grounds of cruel and inhuman treatment endangering her life, and desertion. In a cross-bill the defendant asks a divorce

1. DIVORCE: desertion: evidence. from the plaintiff on the ground of desertion. The trial court gave the plaintiff a divorce and permanent alimony in the sum of $7,500, and the defendant appeals. These, parties were first married on the 17th day of October, 1894, and lived together until in December, 1900. They then had three children. In January, 1901, the plaintiff was divorced from the defendant on his default, and on the 28th of the following May they were married a second time. They lived together until in November, 1907, when they again separated. This action was brought in November, 1909, more than two years after the last separation. There were then five children, all of whom were minors, and the plaintiff was given the custody of the two youngest; one of the two being the only son of the parties. The court is not agreed on the question of the sufficiency of the evidence to warrant a divorce on the ground of cruel and inhuman treatment, and, in view of our conclusion on the other branch of the plaintiff's case, we need not discuss that question. The plaintiff's prayer for a divorce on the ground of desertion is based on the claim that the defendant compelled her to leave their home at the time of their separation in November, 1907. Preliminary to a recital of the transaction of that day, and of the specific events bearing directly thereon, it should be said that the marital relations of these parties had been far from pleasant and harmonious for a long time prior thereto. They were not congenial, and seem to have had nothing in common. The most ordinary conduct of each seemed to irritate and displease the other. The defendant was very confident that he was able to and could

manage his own business without any suggestions or inter-
ference on the part of the plaintiff, and resented any such
action on her part.   On the other hand, the plaintiff had
a mind of her own, and felt, perhaps rightly so, that they
were both laboring for the common good, and that she
should have something to say about matters touching their
financial and personal interests.

In answer to the question how she came to leave their
home in November, 1907, the plaintiff testified:

A. Well, about two weeks before the date he took me
away, he wanted to go to a sale and buy a span of mules,
and I told him, for the reason that he was in debt so,
he did not need them; he had twenty-four head of work
horses, and did not need them, and if I was him I would
not do it.  Well, that made him mad, and then he wanted
to buy a corn husker and pay $350 for it, and I told him
I would not do it, and that made him mad, and then for
two weeks he was mad about it, and said I had to leave,
and said, as long as I was there and interfering with his
business, that he could not go ahead and do anything, and
I would have to get out of there.   Q. What did he do
toward getting you out, if anything?   A. Well, Mamma,
she came up on Friday, and he says to me, 'Your mother
is here, and you can go home with her,' and I says: 'Well,
I ain't going.  I ain't thought anything about going, nor
I ain't intended to.'   'Well,' he says, 'you have got to go
now.  You can go down on the train.  I will hitch up and
take you.'  'Well,' I says, 'I ain't going.  The train is past
due now, and I won't have time to get ready anyhow.'
Well, he says he would take me, and Mamma had gone
then to the train; so he went out and hitched up, and he
came in then, and I was not ready, and the third time
he come in he says, 'You have got to go,' and wanted to
know if I was ready, and I told him I was not, but I told
him I could get ready; and I got ready, and he took me
to Tama.   Q. What was the condition of your health at
that time, Mrs. Arment?   A. Well, it was pretty bad.  I
was not able to ride to Tama; that was what I told him,
but he said I had to go, and I said, 'If that is the case, I
can go.'  He took me to Mamma's and told her he had

brought me down there to stay. My mother was living in Tama at that time. She still lives there. After we got to Tama, we went down to the bank. He said we would go down and have things straightened up, because he would not have time to come back again, and we would have things straightened up then; and he wanted to know who I wanted, and I said, 'I haven't thought anything about it, and I have not got anybody, and I don't know anything about it,' and that is when he went and got you. He wanted the eighty acres of land fixed, so that I would have that, and turn the rest over to him. Mr. Bracken and Mr. Huber were present at the time. He wanted to know if that would suit me, and I told him anything would suit me, if he would just keep his mouth shut. Q. Had he said anything to you about this before? A. Never; I did not know anything about it before, until I was at the bank. After we left the bank, we went up to Mamma's and he went home. I suppose he did. He left there.

The defendant claimed that, after the last separation, he asked plaintiff to return to their home, and on her cross-examination she testified on that subject as follows:

Q. Now, did you ever, after you left there on November 9, 1907, offer to go back home? A. No, sir. I told him there was no use of my trying to go back and stay, because I could not the way he was doing. Q. You had made up your mind you could not stay? A. Yes, sir. The second time I made up my mind I could not. Q. And you have never been back since? A. No, sir. Q. What were the things that made you make up your mind that you could not stay? A. Why, the way he done. Q. What did he do? A. He done lots of things. He just aggravated me all the time, night and day. when he was there. He would do things unreasonable, and everything else that would aggravate a person all the time when he was around. Q. When did you make up your mind you could not stay there? A. I made up my mind I would not stay there after he made me leave there the last time. I never told him I would not stay there, because I would have stayed on account of the children, and, as I told him when he took me away the last time, I told him that was the last time he would. I had

never gone before. I never hauled any stuff away from the place before that. I never thought of it. I had never gone away of my own accord before November 9, 1907. Q. Did you ever pull up your carpets and move them down to Potter one time when you were away from him? A. That was the first time when he told me I had to leave. That was the first time we parted, but not after I went back. I never did. I made up my mind the day he took me away that I would not go back and stay there. Q. And you have never changed it since? A. No, sir; because it would not have done any good if I had. I did change it once and went back. Q. And you are not going to try it again? A. No, sir. Q. And you have been of that mind ever since? A. Yes, sir. Q. And that is your present mind? A. Yes, sir. Q. Regardless of what he might offer? A. It would not do any good. He made a good many offers before. I tried it once, but I would not again; no. Q. Although he asked you repeatedly to go back after you left there in November, 1907, you never had any notion of doing so? A. No; not under the circumstances. I told him that I had tried it once, and that I would not try it again because it was worse the last time.

The plaintiff's mother, Mrs. Alice Glaspie, was at the home of the parties the day that the final separation occurred, and she testified about the matter as follows:

I live in Tama City. Have lived there five years. I am the mother of Mary Arment, the plaintiff. I know the defendant, James Arment. Have known him about fifteen years. I have stayed at their home. I was often down there helping them quite a little bit. Worked for them. This was during all of the period of their married life. Sometimes I would be there once in a couple of weeks. Sometimes longer, and sometimes maybe a week. I was there on or about the 9th day of November, 1907. Went the night before; I think it was Friday evening. I went home the next day, about half past twelve. I heard a conversation between Mr. Arment and my daughter, relative to her leaving his home. I heard him tell her she had to get out of there. He wanted her to go home with me; that she could not stay any longer. She didn't go with me. She

was sick in bed. I don't know how long she had been sick. About a week, I think. She was in bed when I left. She had been in bed all that day. She was sitting up when I went up the night before, but she had not done anything. I just got home and got the fire started, when he drove up to the door with her in the buggy. He said that she could not stay up there, and that he fetched her down to me. He said she interfered with everything he wanted to do, and that she could not stay there any longer. After they came, they went downtown. I didn't go with them. She came back to my home that evening. She was hardly able to walk or stand up either.

Mr. J. L. Bracken was a banker of Tama, with whom the defendant did business, and he testified as follows relative to the transaction of November 9, 1907:

I remember of Mr. and Mrs. Arment coming to my bank about the 9th of November, 1907. Mr. and Mrs. Arment came into the bank, Mr. Arment ahead, and without any ceremony he said, 'I want to get that eighty acres released and settle up with this woman.' Q. What did he do after that on the same day? A. What did he do? Q. Yes. A. Well, I don't know what he did. Q. Do you remember of his calling an attorney in? A. Did he call you in that day? I guess that was the day. It has been about two years ago. I think he did call you in there. Q. Do you remember what Mr. Arment said at that time? A. Why, he repeated his statement that he wanted to get that eighty released, and wanted to settle up with this woman. Mrs. Arment did not say a word that I remembee of. She was crying, and I told them they had better go home. I do not think Mrs. Arment said anything. I have no recollection of hearing her say anything. I don't think she opened her mouth. She looked bad. She was nervous and excited some. He was a little bit excited, a little bit out of patience. I had no trouble with him. . . . He said he wanted to get that eighty acres released, and wanted to settle up with this woman. I think I said there was no use in them making damned fools of themselves. 'You had better go home and settle up.' I told them it could not be done; yes, sir. I didn't see how it could be done. I didn't notice that she

had any paper in her hand. The first I saw of her after that was the time that Charles Winders and I went up to her mother's house and talked with her about going back. I went at the request of the defendant. She said she had tried it once before, and it was no use. She simply could not do it. She would not live a year, or something like that. I was present afterward when Mr. Arment himself requested her to come home. He told her that if he had done anything wrong he was sorry for it, and wanted her to come back home. She said, 'You know you won't do it'—something like that. I don't just remember. She had her sister along with her in the buggy. The conversation was very short. My understanding was that she refused to go back.

Mr. S. C. Huber testified, in behalf of the plaintiff, as follows:

My name is S. C. Huber. I reside in Tama. Am a lawyer. I remember the circumstances of a time that Mr. Arment brought his wife to her mother's in November, 1907. Shortly prior to that occurrence, I had a conversation with Mr. Arment relative to his wife. Q. State to the court what that conversation was. A. In that conversation, which took place in my office—I think it was either two or three days prior to the 9th day of November—Mr. Arment told me that he and his wife could not live together any longer, and that he wanted to make a settlement of their affairs, and that Mrs. Arment said that she wanted me to act for her; that he intended to give her an eighty, which would have to be cleared; and that he came to tell me this, so that I would know when they came— just so I would understand just what she wanted; that he would bring her down probably the next day. I saw Mr. Arment again on Saturday of the same week. He said that Mrs. Arment was down at the bank, and that he wanted me to come up there and draw the papers that he had talked with me about the day he was in before; that is, the day of that same week, but I would not attempt to say exactly what day it was. Q. Did you go up to the bank? A. I did. I found Mrs. Arment and Mr. Bracken in the back room of the bank. She was sitting at the window near the end of the table, and was weeping. She seemed to be very nervous and

was sobbing, so that the sobs were loud—I would say convulsive; and I tried to talk to her about the business, and she said she knew nothing about it whatever. As soon as I observed her condition, and she made this statement, I turned to Mr. Arment and said, 'This woman is in no condition whatever to do business to-day.' And in a short time after I left the bank. Mr. Arment has talked to me about the separation or divorce upon a number of occasions. He said a great many things; and in regard to the divorce he had repeatedly said that he was willing to give this woman a 'clearance,' as he always used the term, and that he was not willing that she should have any of the children or give her any property, but that he would give her a clearance and pay for it. That has been his general expression in that regard. He frequently, has said that he wanted her to come back, but always has coupled it with the condition that he did not want her to interfere with his business; that if she came back she was not to interfere or meddle with his business.

There is other evidence tending to corroborate the plaintiff's claim that she was compelled to leave home on the 9th of November, 1907; but we need not set it out. The plaintiff also testified, in effect, that when she left home prior to her first divorce it was at the instance of the defendant, and that he took her away against her protest. The defendant denies that he compelled the plaintiff to leave their home on the 9th of November, and testifies that she left voluntarily, and he is corroborated in this, to some extent at least, by the testimony of two of their young daughters, who were at home at the time. But the defendant's conduct at the bank, which he does not explain, and his subsequent efforts to have the plaintiff return on certain conditions named by him go to strengthen the plaintiff's case. The fact that the two young daughters had lived with the defendant ever since the separation might tend to color their testimony in his interest, though ever so unconsciously done. On the whole record, we reach the conclusion that the defendant compelled the plaintiff to leave him in No-

vember, 1907, and that, in pursuance of such determination on his part, he took her to Tama and left her with her mother. There was no reasonable cause for such action on the part of the defendant. The fact that the plaintiff offered him advice as to financial matters, in which they were mutually and equally interested, furnishes no excuse for his conduct.

The defendant at that time deserted the plaintiff, and, unless the statutory period of desertion was interrupted by good-faith endeavor on his part to have her return, free from improper qualifications and conditions, she is entitled to a divorce on the ground of desertion. *Jones v. Jones,* 95 Ala. 443 (11 South. 11, 18 L. R. A. 95); *Starkey v. Starkey,* 21 N. J. Eq. 135; 14 Cyc. 613; Bishop on Marriage and Divorce (5th Ed.) section 787. And such good-faith action on his part must be entirely free from improper qualifications and conditions. *Day v. Day,* 84 Iowa, 221, Bishop on Marriage and Divorce, section 786.

Here the evidence shows that whatever effort the defendant made to have the plaintiff return was coupled with the condition that she desist from offering her counsel, and submit tamely and without question to the treatment that defendant had theretofore accorded her. In our judgment, the qualifications and conditions thus imposed were improper, and were rightly rejected by the plaintiff. She had shared fully their common burdens, and had been diligent in the care of her little family. There was no reason why she should not counsel and advise in matters touching their common interests, and a refusal on the part of the defendant to give her a respectful hearing was little less than cruelty. No wife with proper self-respect would submit to such conditions of social servitude, and in refusing to comply therewith the plaintiff did not lose her right of action.

2. SAME: conditional offer of cohabitation.

The plaintiff was awarded the custody of the youngest daughter and the son, who is also one of the younger child-

ren, and we are not disposed to interfere with the order.

3. SAME: alimony. The defendant has with him the three oldest daughters, who are minors. The record shows that the defendant was worth, over and above his debts, from twenty to twenty-five thousand dollars, and the trial court gave the plaintiff $500 temporary alimony and $7,500 permanent alimony. We are of the opinion that the permanent alimony is too large, under the circumstances, and that it should be reduced to $5,000, and it is so ordered.

Pending this appeal, the plaintiff has married Mr. Charles Youker, and because thereof the defendant asks that the allowance of temporary alimony be set aside, and 4. SAME: temporary alimony: effect of remarriage. for other relief. The plaintiff was certainly in something of a hurry to again become a spouse, but, notwithstanding the haste, we think the defendant's notion should be overruled. The judgment is *modified* and *affirmed*.