JOSIE MEYER, Appellee, v. FRED MEYER, Appellant.

**DIVORCE:** Proceedings—Re-Opening of Case—Discretion of Court.
1  It was within the discretion of the trial court to re-open a divorce case, after both parties had closed, for the purpose of receiving additional evidence on the part of the plaintiff, where she was somewhat guarded in the language she used in the first place.

**DIVORCE:** Grounds—Cruel and Inhuman Treatment—Evidence.
2  Evidence reviewed, in an action for divorce, and held that the false charges of unchastity were sufficient to justify a decree to the wife on the ground of cruelty.

**DIVORCE:** Alimony—Amount. A decree awarding alimony to a
3  wife in the sum of $7,785, and support of $15 per month each for two children, aged 15 and 16, and $10 per month each for two children aged 9 and 10, until they should reach the age of 18 years respectively, held not excessive, where the husband was worth about $27,000, which had been accumulated by the efforts of both husband and wife.

*Appeal from Iowa District Court.*—RALPH OTTO, Judge.

OCTOBER 25, 1919.

ACTION for divorce. There was a decree for plaintiff, and the defendant appeals.—*Affirmed.*

*J. M. Dower,* for appellant.

*Stapleton & Stapleton,* for appellee.

PRESTON, J.—The parties were married in March, 1901, and lived together as husband and wife until May, 1918. They have four children, whose ages are 16, 15, 10, and 9. Their troubles seem to have commenced about a year and a half or two years before the suit. She charged cruelty such as to endanger her life, in that, without just cause, he has assaulted, struck, choked, and threatened her; that he has cruelly whipped the children in her presence, one time a daughter of 15; that he has accused plaintiff of being unfaithful to her marriage vows, and being intimate with other men, and running after other men; that such charges were made in the presence and hearing of the children and other relatives. She states the property owned by defendant, and that $1,600 of her own money went into the real estate. She asks alimony, and the custody of the children.

Defendant admits the formal allegations of the petition, and denies all allegations as to cruelty.

The decree awards plaintiff a divorce, and the custody of the children; also awards alimony in the sum of $7,685, and the title to certain household goods, which, by agreement, were set off to her for her use, pending the final decree in the order for temporary alimony. Defendant was also required to pay for the support and education of the four children so long as she shall support and educate them, $15 each per month for the two older children, and $10 each for the other two, such payments to continue no longer than until the children attain the age of 18 years, respectively.

1. Appellant complains of the action of the trial court in permitting plaintiff to re-open the case and introduce further evidence after both sides had rested their case. Appellant claims that, after the evidence was closed in the first instance, the court announced that plaintiff was not entitled to a divorce, as the evidence then stood, and that

1. DIVORCE: proceedings: reopening of case: discretion of court.

the court made an entry on the calendar, dismissing the petition. We think the record does not so show. There is a statement in appellant's objection to plaintiff's motion for leave to re-open the case, but this is all that appears in the record on this subject. Appellant says that to permit this presents a temptation to fabricate testimony and to offer strained testimony, after having the views of the trial court, which ought not to be permitted. Such might be the tendency, and the circumstance is proper to be considered. The testimony of plaintiff and two or three other witnesses, given after the case was re-opened, does not change the testimony, in the sense that it materially contradicts what had been testified before. Such evidence had reference to the effect on plaintiff's health, as a result of the defendant's treatment of her. We can conceive of a situation where a party might think he had some reason for not stating the facts as strongly as would be warranted. Some of the reasons given by plaintiff for not stating her true condition in the first instance is that her nervous breakdown was such that she was afraid she was going to lose her mind, and afraid that, if she told these things, they would take the children away from her, and think she was not capable of taking care of them. She testifies that she did not even tell her attorneys as to her real condition. She says:

"I read, to keep my mind off my troubles. I read the Bible many times; seemed like, when I didn't know what else to do,—didn't know where to turn,—what to do,—I read the Bible, simply to afford relief to my mind, so I didn't feel quite so afraid to go to bed; and finally I got so I was afraid I was going to lose my mind. I couldn't stand very much more."

At this point in her testimony, she broke down on the stand, and counsel for defendant asked that the witness be withdrawn from the stand until she could become calm,

and the testimony could be taken in proper shape, so they might understand. She testifies that, when she was on the stand before the case was re-opened, she made an effort to be calm, and not to show her nervous condition, for the reason before given. Her testimony given in the first place shows that she was somewhat guarded in the language she used. Two or three questions will be given to illustrate.

"Q. You sleep good at night, I suppose? A. Oh, I have my sleep, yes; it's always my custom to sleep some at night. Q. What had been your general habit as to sleep? Do you generally sleep sound and well at night? A. Yes, —depends; sometimes I do, sometimes I don't. Q. What is your general habit in that respect? A. I generally sleep pretty fair, only when I had too much of this trouble on my mind. I slept pretty well some of the time this summer."

Her evidence afterwards was stronger than this, as to her not being able to sleep. It was a matter of discretion in the trial court, allowing the case to be re-opened.

2. The parties lived on a farm for 17 years, and appear to have been successful in a financial way. Both appear to have been industrious. Plaintiff taught school before she was married. Counsel, in argument, concede that defendant is somewhat coarse in his make-up, and that, according to the preponderance of the testimony, he is quick-tempered; that it was largely a question of handling him right. He says that plaintiff is rather of a sullen disposition, lacking in tact in jollying him up. We shall not attempt to set out the evidence at any length, nor go into details as to the numerous matters testified to. Plaintiff testifies as to his accusations against her of unchastity, and says that, at one time, when the oldest boy was about a year old, she told him that she expected another child, and he said it was no wonder; that "every old thing

2. DIVORCE:
grounds: cruel
and inhuman
treatment:
evidence.

that come around there had to stay around there." At an-
other time, before the last child was born, she told him she
expected another child, and he said, "It's no wonder, every
time you get a hot spell, you go and run to Pirkl's, after
Charley Pirkl." The party mentioned is a cousin of plain-
tiff's. As to the parentage of one of the children, she says
he told her that she just picked up Gladys, when she was up
in Johnson County at a wedding. She testifies that, two
years ago, he started to call her dirty names; that he called
her an old bitch, and said that she was an old whore, an
old slut, and a slop barrel; that, at another time, when his
mother was sick, plaintiff went up to see her, and they
asked her to stay all night and help care for her; that, the
next morning, when she went home, defendant said she did
not need to stay, and that all she went over there for was
to run with other men; and that sometimes he said, "to
whore around with other men." She says he called her a
son of a bitch more than once, a gray-haired bitch. At an-
other time, he said she and another man would make a
pretty good pair. At another time, he told her she might
as well go along with the man who was hauling cream,
and that maybe he could make a few dollars, besides selling
produce to him. At another time, an agent called at the
home, and defendant told her that she ought to have gone
along with him; that she might make something—at the
same time calling her dirty names. She testifies that some-
times he would call her names and swear at her for two and
a half hours, the same words, over and over. Some of these
were in the presence of the children. At another time, as
she and the oldest boy were leaving the house, to attend the
funeral of a niece, in Johnson County, defendant said:

"You may as well leave that old slop barrel down
there. Tell her mother she can keep the old slop barrel
there. I ain't got no use for her,—all she is good for is to
run around with other men, anyway."

Two or three besides the family were present at this
time. The next morning, when she returned home, she says
he seemed to turn suddenly crazy; called her names; said
all she went down there for was to run around with other
men,—that she didn't care anything about the funeral; that
he kept repeating these things over and over again; that
he then told her to leave the place; that she could go and
stay; that he had no use for her; and that, if she didn't
go, he would kick her out; that she looked as though she
got the bad disease down there yesterday. At another time,
in speaking about kerosene, he said they didn't need to blow
the light out, "because she has got plenty of money, she runs
around with other men at least twice a week, and she can
buy kerosene." On cross-examination, defendant himself
testified that, when she was at her brother's, plaintiff asked
him to take back the statements about her running around
with other men, before she would come back; that she
asked him to take them back, and he told her he had noth-
ing to take back; that he believed these statements true.

"Q. You believed it when you talked with her down to
your brother-in-law's, Zahradneck's, and you believed they
were true, and do now, don't you? A. I do. Q. Do you
want to live with a woman that is guilty of that? A. If
you want to ask me some questions, set down in your chair.
I called her sow, because she used a syringe. I never said
anything out of the way to her. She did go around with
other men. She sent for a syringe, after she came back,—
after she had been running around with other men I spoke
about. I can't prove I ketched her doing anything. Q. But
still, in your own mind, you feel there is something wrong,
don't you? A. No, I told her to stay at home and take care
of her stuff. Q. You thought your wife had been guilty of
some relation with other men, didn't you,—that is why she
was using this syringe? A. It was. There was something
wrong. I did give her a calling down when they went with

John Kroul; I told them they had no business running with him; I did say that in the presence of the children."

Kroul is an uncle of plaintiff's, and 10 years her senior. She is 42. The witness says, further:

"I told her at one time, if she wanted to run with old. John Kroul every place, she could go down there with him to this box social; I told her. I accused her before all the children of running around with John Kroul. She was guilty. It is so."

It appears that, in regard to the last-mentioned transaction, the children were present, and two young sons of John Kroul's. Defendant refused to go with them, and refused to permit his wife to get into the surrey with the children that night. She testifies that he struck her more than once, once when she did not want to go to a neighbor's with him for apples. At another time, she says he struck her on the side of the head, several times. She testified to defendant's giving one of the boys a severe whipping, because the boy did not hear him call. She says that sometimes when he did get mad, it lasted a week; that he was in the habit of spitting tobacco juice in the oven; that she worked in the field, plowed corn, harrowed, shocked grain, put up the hay, and did chores, milked the cows, and gathered corn. Within the year before the final separation, she left him, and went to her brother's. Defendant came to see her, and inquired if there were any bums staying there. She says that, at that time, defendant asked her if she was going to send him to the penitentiary, and she told him she hoped it would not come to that. During this talk, she told him that he had abused her, and that, if he would sign a paper that these things he had been saying were not true, she would think about going back to him, and he said he would not take back anything. She told him there was not a word of truth in the things he had been saying, and he knew it, and she couldn't live with him and have him abuse

her like that. He told her that, if she wanted to promise to keep her mouth shut, and keep away from the telephone, and not go to any of the relations, she could come back and live, if she wanted to. She testifies that, if she wanted any clothes or anything, he said that she could get them off of other men, and that he told one of the girls the same thing, when he talked to her: that, if she needed things, they could get them that way.

We shall not go into the evidence further. There are many other circumstances testified to by plaintiff. Twenty-two other witnesses testified for her. The children testified to some of the transactions. Plaintiff is corroborated as to some of the transactions, though perhaps not all, by other witnesses, and by witnesses other than the children. There is no evidence to justify the defendant in saying that plaintiff was guilty of adultery. The defendant denies many of the circumstances testified to by plaintiff and other witnesses, and makes charges against her as to her conduct. Doubtless she has not treated defendant, at all times, as she should. Defendant introduced some eight or ten witnesses, several of them testifying to the value of defendant's land, and the character of it, and the personal property. Others of them testify to seeing the parties out together occasionally, and they say that they seemed friendly, and the children seemed to be well dressed; that they visited occasionally and threshed there, and didn't hear him talk coarse to her or the children. Some of them say that plaintiff and defendant did not speak to each other when they were out. Others said that they seemed to get along all right, so far as they noticed. There is a large record. After reading the evidence, we reach the conclusion that the evidence is sufficient to justify a divorce.

3. Appellant argues briefly that he thinks that, under all the circumstances, the alimony allowed is rather severe. The farm consists of 120 acres, and about 10 acres

of timber land.   The evidence varies as to

3. DIVORCE: ali-    the value.   Plaintiff's witnesses think it was
mony: amount.

worth $150 an acre, at the time of the trial.
Some of defendant's witnesses put it at $125.   The land is
worth in the neighborhood of $18,000, and the personal
property, about $9,000, or a total of about $27,000.   When
the parties were married, plaintiff had saved $300 from her
teaching, and she had a small amount of personal property
that her people gave her, and she received about $1,200
from her father's estate, later, which, she says, was put into
the farm.   We do not understand the defendant to dispute
plaintiff's testimony that $1,600 of her money went into the
farm.   When the parties were married, the defendant had
but little property.   Aside from what plaintiff put into the
land, the estate has been accumulated by the efforts of
both.   We are not disposed to interfere with the allowance.
The decree is—*Affirmed.*

LADD, C. J., EVANS and SALINGER, JJ., concur.