LELA RIEMENSCHNEIDER, Appellant, v. LOUIE RIEMENSCHNEIDER, Appellee.

No. 47062.

(Reported in 30 N. W. 2d 769 and 32 N. W. 2d 68)

618

FEBRUARY 10, 1948.

SUPPLEMENTAL OPINION AND REHEARING DENIED APRIL 9, 1948.

Joe B. Tye, of Marshalltown, and Lundy, Butler & Lundy, of Eldora, for appellant.

Boardman, Cartwright & Druker, of Marshalltown, and Hyland & Hyland, of Tama, for appellee.

BLISS, J.—At the time of the trial which commenced on October 21, 1946, the parties had each reached the age of fifty-one years. When they were twenty-four years old they were married at Mason City, Iowa, on July 30, 1919. Shortly afterward they moved in with his mother on the old farm home of his parents on the west side of the town of State Center, in Marshall County, Iowa. The mother moved to State Center the following spring. Before the marriage plaintiff had clerked in

a store in State Center. She brought into the home a bedroom suite, and a kitchen table which her father had made. Defendant had some farm equipment, horses, cattle and hogs, and some money. The farm contained 195 acres. Electricity and water from the public utilities at State Center, and hot water heat in the residence, afforded them modern conveniences. Each of them was a capable and industrious worker. They kept hired help on the farm. Plaintiff raised much poultry hatched in incubators on the farm. For some time they kept a large herd of cows and sold milk over a route and to dairies. Much of the defendant's time was spent in buying, feeding and selling cattle and hogs for the market. At times they had 200 head of cattle, and hogs enough to run with them.

Four children were born to them. Floy, the first child, was born March 19, 1922. She is married and lived near her parents. Wayne was born January 5, 1924. He also is married and lives near by. Don Earl was born March 3, 1926, and is going to school at the University of Iowa. Jean was born August 9, 1928, and is attending the State Teachers College at Cedar Falls.

Defendant, his two sisters, and a nephew, each inherited an undivided one-fourth interest in the home farm occupied by the parties. Just when they came into this inheritance does not appear. On May 26, 1944, defendant received deeds from his sisters to their interests in this home farm and paid each $9,000 therefor. At the time of the trial he owned an undivided three-fourths interest in this farm which plaintiff and he occupied. His nephew, Roscoe Riemenschneider, owns the remaining one-fourth share.

Defendant bought a farm near Rhodes, in Marshall County, Iowa, which he sold prior to the divorce proceedings. The record does not show the size, cost, or selling price. About 1940 or shortly before, he bought what is known as the Allison farm near State Center and about a mile from the home farm. It has good soil and lies perhaps better than the home farm. It was once rather overimproved with buildings for its size, but they are now quite dilapidated. The farm contains 92 acres. The record does not show the purchase price. The son Wayne lives on this farm.

Defendant had a cousin, William A. Riemenschneider, ten years his senior, who lived at State Center. Their fathers were brothers and their mothers were sisters. In 1932 or 1933 defendant and William, from their own resources, bought lots on trackage of the Northwestern and Great Western Railway Companies, in Marshalltown, and erected buildings thereon which they equipped for a meat packing plant. One Ed Tehel, who had some experience in that business, had some interest in or connection with the venture. The business was operated for about two years and then was incorporated under the laws of Iowa on May 20, 1935, as The Marshall Packing Company, and started business as a corporation on July 1, 1935. Defendant was the president, W. A. Riemenschneider, the vice president, and Ed Tehel, the secretary of the corporation. Its authorized capital stock of $50,000 was divided into 500 shares of a par value of $100 each. One issue in the case is the number of shares of stock in the corporation owned by the defendant.

By stipulation of the parties, the court on June 3, 1946, made an order that R. A. Wester, a certified accountant of Marshalltown, be employed to make an audit and written report thereof upon the properties and business of the Marshall Packing Company as of October 13, 1945, and as of June 1, 1946; and that Rau Appraisal Company, of Chicago, be employed to make an appraisal of all of the tangible and intangible properties of the company. Copies of each report for use of court and counsel were ordered filed with the clerk of the court, and the charges for each were ordered to be paid by defendant.

The parties stipulated that twenty-four items of property, real and personal, belonging to defendant, in addition to the farm properties and packing house stock, above noted, were of an aggregate value of $51,177.70.

The court, among other "Findings Of Fact" not complained of, found: that defendant had inherited an undivided one fourth of the 195-acre home farm, and had purchased an undivided one half, and was the owner of an undivided three fourths thereof, fully paid for and free of incumbrance, other than current taxes, and that it had a market value of $225 an acre, at which the valuation of the inherited part would be $10,968, and of the purchased part approximately $21,936; that the

92-acre Allison farm is worth $225 an acre, or $20,770; that the 24 items of miscellaneous personal property, real estate, cash, bonds, etc. were of an agreed valuation of $51,177.70; that the defendant owns 190 shares of stock in the Marshall Packing Company and no more, W. A. Riemenschneider owns 190 shares, Ed Tchel, two shares, J. H. Brennecke, two shares, and the disputed 98 shares are the property of the Marshall Packing Company; that aside from the today's replacement value of the fixed properties of the company, and the book value of the assets, "there is a dearth of established elements from which to determine the value of the stock. The defendant owns in stock approximately half of the assets of the company and, beyond doubt, they have value. The business is an uncertain one. In my opinion, from the evidence in this case, the Marshall Packing Company is Louie Riemenschneider and, should he step out, it is highly probable that the value of the plant and equipment would shortly be greatly depreciated. There is no testimony as to the market value of the plant and its equipment and there is no testimony from which I can determine the value of the stock. It is not incumbent upon the Court to guess at the value of the stock, nor to fix any value upon it *in order to make an equitable allowance to the plaintiff*. [Italics supplied.] From the foregoing, exclusive of the Marshall Packing Company stock, the total value of the defendant's property is approximately the sum of $104,700.00; and, in my opinion, an allowance to plaintiff in property and money to the extent of $37,-000.00, with the costs and expenses of this suit taxed to the defendant, is a fair and equitable division."

The court directed the attorneys for plaintiff to prepare a decree granting an absolute divorce and custody of Jean and Don Earl, and awarding her the household goods in the nine-room home with finished and furnished basement, at a valuation of $500, and $36,500 in cash of which $16,500 was payable forthwith, and $20,000 on or before June 1, 1947. In addition the defendant to pay plaintiff's attorney fees in the sum of $1,500, and the costs of the suit including the charge of R. A. Wester for services as accountant in the sum of $600, and a reasonable charge for the Rau Appraisal Company.

As an alternative, plaintiff was offered the same allowance of $37,000 with the choice of taking as part satisfaction thereof the 92-acre Allison farm at a valuation of $20,700, with costs and attorney fees as above stated.

The daughter Jean is in college and if she continues there, defendant will pay the expense thereof up to $800 a year for three years beginning in the fall of 1947.

Plaintiff chose the all-cash award and a decree was entered accordingly with the other provisions above noted.

The appraisal charge so far as the printed record shows has not been fixed. The decree provided that the court will determine the amount of it at a future time, "unless such charges shall have been adjusted by the parties." It is probable that this charge considerably exceeds the certified-accountant charge. The appraisal was the ascertainment of the today's replacement value of the physical plant (land, buildings, equipment, fixtures, machinery, tools, etc.), that is, the present cost of replacement. And from this valuation, depreciation was taken to arrive at an estimated net sound (depreciated) value. An experienced appraiser with assistants did the field work for five days and gathered the necessary data which was sent to Chicago (the home office) where from the information files and by further correspondence, investigation, and research, all factors in replacement costs, including labor, materials, transportation, architect, supervision, etc. were ascertained, together with depreciation, and compiled in a 118-page report.

Plaintiff relies for reversal or modification on these propositions: 1. The evidence establishes a valuation of $250 on the home place. 2. The court should have awarded plaintiff the home place. 3. The court should have found that defendant owned 288 shares of the packing company stock. 4. The court failed to award plaintiff an equitable share of the property.

I. We are not inclined to disturb the court's finding of the value of the 195-acre home farm. Three witnesses for plaintiff who knew the farm from driving by it on two sides, but had not been over the farm, valued it at $250 an acre as of June 1946. A witness for defendant of wide experience in the value and sales of farm land, who was familiar with the farm and

made a close examination of it, placed its value at $225 an acre. A ditch with water in it at all times to a depth of four feet or more, requiring two bridges across it, cuts across the farm, making several irregular fields with point rows. The ditch drained an extensive watershed, and while it ran through pasture land considerable of it required tiling to make it tillable, and the witness thought that because of the water which came from the watershed the tiling would not be fully effective and might not permit rotation of crops. The fact that there was a divided ownership of the farm detracted from its salability, value, and use.

II. Plaintiff said she desired the home farm largely for sentimental reasons, as it had been her only home during marriage. She offered to take it at $250 an acre. During 1946 it was rented and she lived with the tenant and his family. Defendant and his nephew are very close and congenial co-owners. Whether she and the nephew, or whether she and her son Wayne and the nephew, could work together so amicably could hardly be expected. She had the opportunity to take the Allison farm, on which Wayne is now a tenant, but declined. The large farm is the Riemenschneider old homestead. It is also worth more to defendant as an adjunct to the packing business than it is worth to plaintiff. The grounds urged for modifying the award of the court do not appear to justify it.

III. Just how many shares of stock the defendant owned in the packing company is a fairly debatable question. Defendant and his cousin furnished the capital to establish the plant, the physical assets of which justified the paid-up issuance of 300 shares of $100 par value capital stock of the corporation, with some excess value. These assets, so transferred, with the deducted liabilities, are shown in a journal entry recorded in the corporation books at the time of the transfer as follows:

"Assets: Cash on hand and in bank..$    672.28
       Accounts receivable—
          Trade ..............    5,206.98
       Merchandise Inventories ..    2,546.50
       Real Estate—Land &
          Plant Buildings ..... 20,000.00

Machinery & Equipment .. 7,926.23

Total Assets .....                    $36,351.99

Deduct—Liabilities:
    Notes Payable ........$ 1,313.83
    Accounts Payable ..... 2,491.66

Total Liabilities ...              $ 3,805.49

Net Assets ........                $32,546.50"

Upon the transfer of these assets to the newly organized corporation 300 shares of the capital stock were issued as follows:

"W. A. Riemenschneider–certificates 1 to 10 for 100
    shares– ...................................$10,000
L. Riemenschneider–certificates 11 to 20 for 100 shares–$10,000
L. Riemenschneider–certificates 22 to 30 for 98 shares–$ 9,800
Ed Tehel         –certificate 21       for 2 shares–$ 200

Total ........................300 shares–$30,000"

On the personal account of Louie Riemenschneider in the corporate books he was credited with $19,800, and when the 198 shares of stock were issued to him his account was charged with $19,800. Similar bookkeeping appears as to W. A. Riemenschneider and Ed Tehel. The difference between the $32,546.50 book value of the assets and the $30,000 stock issue, of $2,546.50, was credited to the paid-in or capital surplus account. It still so shows on the balance sheet of June 22, 1946, prepared by the accountant, Wester.

All of these certificates are signed by Louie Riemenschneider as president, and Ed Tehel as secretary. Certificates Nos. 1 to 20, inclusive, bear no date. None of the assignment blanks on the backs is filled. Certificate No. 21 issued to Tehel is not an exhibit. Certificates Nos. 22 to 30, inclusive, are dated May 20, 1935. On the back of each of these certificates is a filled out assignment signed by Louie Riemenschneider dated May 20, 1935, except No. 27 on which the assignment is dated September 1, 1935. The assignee of each certificate is Ed Tehel.

An examination of certificate No. 22 for 18 shares, and certificate No. 23 for 10 shares, shows that on the face of each in the blank line for the name of the stockholder to whom the certificate was issued the name "Ed Tehel" was first written, and later the name "Louie Riemenschneider" was superimposed.

W. A. Riemenschneider was a witness for plaintiff. In his direct examination, inquiry about his knowledge of these 98 shares was made. He answered that he knew about their issuance and that they were supposed to go to Ed Tehel if he made good. He testified:

"Q. Was this stock ever paid for, the 98 shares? A. Paid for? I don't think so. Q. Well, do you know how it came to be issued in the name of Louie Riemenschneider instead of to Tehel? A. What? Q. You said it was issued—that Mr. Tehel should have it if he made good? A. That is right. Q. How did it happen to be issued to Louie Riemenschneider? A. It was just issued in his name at that time. Q. Did he keep the stock in his hands? A. No. Q. Did he deliver it to Mr. Tehel? A. No, he didn't. Mr. Tehel didn't get it. Q. How did you come to replevin it if he didn't get it? A. Well, he had it. He took the stock out of the box down there and took it up to his house."

Defendant then offered the files in a replevin action in the district court of Marshall county, in which the Marshall Packing Company was plaintiff and Ed Tehel was defendant. The petition filed March 8, 1937 alleged that plaintiff was the owner and entitled to the immediate possession of the 98 shares of stock which had been issued in the name of Louie Riemenschneider but which had not been delivered, nor for which any payment had been made; that the stock had no real or intrinsic value, but that the same was left in the office of plaintiff, having been endorsed by Louie Riemenschneider on the back thereof, but not transferred on the books of the company nor in fact not issued nor reported to the secretary of state, nor had the stock been paid for; that defendant, Tehel, had wrongfully taken the stock, and without having paid any consideration therefor and without any authority of the officers of the company had filled out the assignments on the backs of the certificates

to himself. By amended answer, Tehel alleged that he and Louie and William Riemenschneider had owned equal shares in the partnership which had been in operation under the trade name of the Marshall Packing Company since about November 17, 1933, before its incorporation; that he was experienced in the packing business, secured the location, provided equipment for the plant, organized it as a going concern, built the sales business from nothing to more than $100,000 a year at the time of incorporation, as general manager, and had donated his interest in the profits, and in addition over $1,300 of equipment, and that he had received as compensation only $10 a week and expenses when away from Marshalltown on company business. He alleged that he was the owner of the 98 shares and was entitled to their possession. The jury found that the plaintiff, Marshall Packing Company, was entitled to the possession of the stock.

Plaintiff objected to the admission of these files as hearsay and not binding on her, and as self-serving statements on the part of Louie Riemenschneider as president of the company.

The accountant, Wester, was a witness for plaintiff. He testified that when he examined the 98 shares of stock, he noticed the assignments on the back of the certificate to Tehel and he asked Louie Riemenschneider whether they had any validity or if they had any importance and whether it was intended that the certificates would be transferred and he said "No." Of these 98 shares, Wester, the accountant, testified: "I checked the stubs and found the stubs and the certificates corresponded."

On April 24, 1942, certificates Nos. 33 and 34 for 90 shares of stock each were issued and signed by Louie Riemenschneider, as president, and Tony Artner, the sausage maker, as secretary, to W. A. Riemenschneider and to Louie Riemenschneider, respectively. When Artner was named as secretary of the company he was issued certificates Nos. 31 and 32 each for one share, on August 16, 1937. He paid $100 for each share. On February 19, 1946, Artner assigned each certificate to J. H. Brennecke, who then became secretary, and paid $200 for the two shares. When Artner surrendered the certificates he was repaid $200. Artner and Brennecke as witnesses for the plain-

tiff each testified that they performed no duties whatsoever as secretary, except to sign income tax reports prepared by someone else. Neither received any compensation as secretary.

At the time of the issue of the two certificates of 90 shares each on April 24, 1942, there was on the books of the company an account payable owing to Louie and William Riemenschneider. It was a joint account showing an amount payable to the two of them but not identifying how much thereof each was entitled. The account originated in 1936 and received credits at various times and in some instances cash. In other instances payments had been made by them for the company for which they received credit. The account also included credits for salary to Louie which he had not drawn. He was also charged with cash withdrawals from time to time. On January 1, 1942, there was a credit balance in the account of $19,547.78. When the 180 shares of stock were issued April 24, 1942, the account was charged with $18,000.

Wester testified:

"The amount of outstanding capital stock which has been paid for and held by the various stockholders is 482 shares issued and outstanding, indicated on the books as having been paid for by cash and by property. W. A. Riemenschneider holds 190 shares, Louie Riemenschneider received 288 shares, Ed Tehel 2 shares, and Tony Artner, 2 shares. * * * There is nothing on the books that in any way shows that the 198 shares originally issued to him [Louie] were not fully paid for. On the contrary, the books show on the face of them that the 198 shares were fully paid for; and that is in addition to the last 90 shares."

It is clear that Louie and William furnished assets in excess of $30,000, which paid for and authorized the issuance of 300 shares of stock. William received 100 shares and has claimed no more from that issue. Louie was credited with $19,800 on the corporate books, and 198 shares were issued to him and charged to him in this account. It may have been that Tehel was to receive part or all of 100 shares "if he made good." There is some evidence that he did not make good. His

connection with the company was severed. The evidence is that the assignments to Tehel of the 98 shares are of no force. These shares were issued to Louie and remain of record in his name and were paid for by him. The judgment in the replevin suit was merely that between the company and Tehel, the company was entitled to their possession. The record sustains a finding that Louie Riemenschneider owns 288 shares of stock in the Marshall Packing Company instead of but 190 shares.

IV. Plaintiff contends that the decree does not award her a fair and equitable share of the property. That is the ultimate and real question in the case. She insists that the court gave no consideration to the company stock in making the award of alimony. We do not agree with this view. It was the duty of the court to make a fair award. We assume that it attempted to do so. We cannot assume under the record that it disregarded any property in doing so. While it did not fix the specific value of the stock, it expressed its appreciation of its worth in finding that "the defendant owns in stock approximately half of the assets of the company *and*, [*no*] *doubt, they have value*," and in further stating that it could "*make an equitable allowance to the plaintiff*" without fixing exact values. Even though we disagree with the court in its finding that the company owns the 98 shares, yet it recognized that on that basis Louie owned one half of the assets represented by that stock, and we may assume considered it in awarding alimony. Had the court ignored the corporation stock it is unlikely it would have said: "* * * in my opinion, an allowance * * * of $37,000.00, with the costs and expenses of this suit taxed to the defendant, *is a fair and equitable division*." (All italics supplied.) In addition to the above sum there was an award of $1,500 for plaintiff's attorneys, and an award of $2,400 for the education of Jean. These three sums total $40,900. It is not probable that the court made that award on the basis of a property value of $104,700. It would have been a quite liberal award under the record, particularly when of that sum of $104,700, approximately $11,000 was the value of property Louie had inherited, and a considerable sum was his when he married, to neither of which plaintiff had contributed. While there is no rule of law in Iowa fixing the ratio of alimony to

the value of the property owned by the spouse against whom it is awarded, the amount which would have been the distributive share of the spouse in the latter's estate is oftentimes used by the courts as an approximate measure. If the court used such a yardstick, the valuation it placed on defendant's property was considerably in excess of $120,000. While the defendant, being the party in fault, should pay the court costs ($265.75 in the trial court) and his attorney fees, he was also taxed with the accountant's charge of $600, and the appraisal charge of probably double the latter amount, both of which services were of benefit to each party. Plaintiff has some property of her own worth perhaps $1,000 or more. Defendant owes a debt to the packing company of $2,292.11 since 1943. There is no evidence that defendant has concealed any of his property. He agreed to valuations on numerous items of diversified property.

The only property of questioned value was the corporate stock. As the court found, there was "a dearth of established elements from which to determine [its] value." There was no evidence of what it would sell for on the market. None had been sold except to the secretaries, perhaps to qualify them to hold the office. It was a family corporation. Its stock was not on the market and never had been. Neither the expert accountant nor the expert appraisers from the Rau Appraisal Company was qualified to express opinions as to the actual value or the market value of the stock, and they did not attempt to. The accountant audited the company's books of account and corporate record and reported and testified to what the books showed as to the cost of the fixed assets, their depreciation, and book values, the current assets, and the liabilities. His report was as of June 22, 1946—the reason for that date being that the inventory was then taken, and the income was established to that date. The balance sheet on that date shows the cost of fixed assets (land ($1,162.50), buildings, machinery, equipment and trucks) was $59,192.08, the depreciation was $26,209.86, and the difference or book value of these fixed assets was $32,982.22. The current assets (cash and money in bank, bonds, accounts receivable, inventories) were $31,263.55. The total fixed assets (book value) and current assets were $64,245.77.

The total liabilities equaled that sum and included stock issued, excess paid-in capital surplus ($2,546.50) and earned surplus ($4,445.90). The accountant testified:

"The book value may be more or it may be less than the actual value * * * The valuation of a corporation, or its capital stock—when you speak of the value of a corporation you are really speaking of the value of its capital stock—is dependent, as I see it, upon other factors than the mere value of its fixed assets."

When the fixed assets of the partnership were transferred to the corporation at its organization the real estate and buildings were valued at $20,000, and the machinery and equipment were valued at $7,926.23. The appraisal by the Rau Appraisal Company was made as of June 1, 1946. The buildings are all one story and for the most part frame, or hollow tile. The lots were valued at $2,750 and including them and the buildings, equipment, motor vehicles and all physical assets, the new replacement value or cost was placed at $84,870.96. With accrued depreciation of $20,259.88 deducted from the above valuation, what is spoken of as a net sound value or depreciated value of $64,611.08 was found. The new replacement value was based upon the present cost of labor, material, transportation and other construction factors, and that value noted above included architect and other fees in excess of $3,000.

Plaintiff by adding what she computes as the value of the company's current assets of June 22, 1946, to the appraisal company's net sound value of the fixed assets ($64,611.08) reaches a total of $90,050.54 which she says is the total value of the company as of that date. Dividing the latter sum by 482, the number of issued shares of stock, the quotient is $186.83, which she claims is the value of each share. By like computation she arrives at a share valuation of $189.47 as of October 13, 1945, the approximate date of the separation of the parties.

We question the soundness of arriving at the value of corporate stock by the method followed. Many banks operating in buildings costing much money have failed to the great financial loss of their stockholders and depositors. The Marshall Packing Company in the first year of its corporate existence,

ending June 30, 1936, with total fixed and current assets of $32,546.50 had a *net income of $532.08,* while in the first five months and twenty-two days of 1946, with fixed assets having a replacement value of $64,611.08 and current assets of $31,-263.55 it had *a net loss of $5,029.51.* Many factors have a bearing upon the value of corporate stock. Section 4657 of 9 Fletcher on Corporations, Perm. Ed., chapter 51, states:

"A proper valuation would involve considering rate of return, security afforded that dividends would be regularly paid, possibility that dividends would be increased or diminished, size of accumulated surplus applicable to payment of dividends, record of corporation and its prospects for future, general investment value of stock, selling price of stocks of like character, appraised and sale value of assets, book valuations, market conditions, reputation of corporation, and any other relevant evidentiary fact and circumstance entering into value of corporate property and reflecting itself in the worth of corporate stock."

A most important factor in the value of corporate stock is the net earnings of the corporation. The court said of the Marshall Packing Company: "The business is an uncertain one." The evidence supports this conclusion. The earned and accumulated surplus on June 22, 1946, as shown by the balance sheet of that date, from July 1, 1935 to June 22, 1946, was $4,445.90. That was the surplus balance of earnings during a period of eleven years of operation. No dividends had ever been paid. At the end of the years 1936 to 1942, inclusive, that earned-income account was in the red or showed a deficit for each year, respectively in the sums of $2,050.12, $5,163.63, $6,697.29, $6,840.36, $6,350.46, $4,342.10, and $4,196.40. The surplus balance was $771.88 at the end of 1943.

In the year ending June 30, 1936, the net income was $532.08. In the last six months of 1936 the net loss was $5,128.70. For 1937 the net loss was $3,113.51. For 1938 the net loss was $1,533.66. For 1939 the net loss was $143.07. In 1940 the net income was $489.90. In 1945 the net income was $5,597.56, but the company was saved from a heavy net loss by a United States subsidy of livestock slaughter payments of $44,931.52.

From January 1, 1946 to June 22, 1946, there was a net loss of $5,029.51. Had it not been for such subsidy from the United States of $35,296.01 the net loss would have been $40,325.52. During the war years these adventitious aids from the Government were like unto the Biblical manna.

Not much attention was given to the usual practices of corporate management. There was no board of directors. A stockholders' meeting was an occasional talk between Louie and William of which no records were kept. Miss Jarrett, apparently a very capable woman, ran the office, after she was employed in 1937. As she testified it was "really a one woman office." The manner in which the company had always been operated would stifle any desire in an outsider to purchase any of the corporate stock. Louie and William owned the company and they operated it as they pleased and solely for their own benefit. There were no other stockholders to consider in the operation of the business. In 1937 and 1938 William was the manager. He testified: "I have never collected any salary during the time I have been connected with the Marshall Packing Company and never received any dividends." Louie had a salary of $50 a week during the later years. The packing business was to a large extent operated as an adjunct to the livestock and farm businesses of Louie and William. Each of them had sold much livestock to the company. William had sold 25 head of cattle to the company a short time before he testified, for which he had not then been paid. He also had a credit on the books of $3,666.89 arising from transactions which occurred prior to 1944. Considerable of the time and effort of the cousins was spent elsewhere than at the packing house. This was certainly true of William, who testified: "Well, I probably ain't been down there the last year or so." During 1945 and to June 21, 1946, Louie made 28 deliveries to the packing company of 328 head of cattle and 76 head of hogs weighing 304,855 pounds for which he received $45,157.28. These transactions for other years do not appear in the record. When stock was purchased at the packing plant too light to kill, it was purchased by Louie or William and fattened at the farms and resold to the company.

Plaintiff stresses the fact that the yearly net incomes of

Louie as shown by the Federal and State Income Tax Returns were as follows:

"1940 Federal $6,233.55, State $6,233.55
1941 Federal $5,836.52, State $5,836.33
1942 Federal $10,545.54, State $10,366.61
1943 Federal $13,202.71, State $10,841.89
1944 Federal $16,828.62, State $10,068.50
1945 Federal $12,957.81, State .........".

But it is clear from the record that no part of these reported incomes was from earnings on his stock in the packing company. The only portion was his $2,600 salary. The remainder was from his farm and livestock operation, or by playing the market ––one of the 24 items of property among those of a total agreed valuation of $51,177.70 was a credit of $2,228.75 with Lamson Bros. (stockbrokers). The record establishes that the net income and earnings on the corporate stock from the organization of the company were negligible. They would have been much less each year had an adequate salary been paid for the services of Louie and William. Defendant no longer operates his two farms. They are each rented. His opportunity to use them in conjunction with the packing plant in the feeding of livestock and thus increase his income is limited and perhaps ended.

It is our conclusion that the alimony award to the plaintiff and the property division between the parties is fair, just, and equitable, considering all facts shown, and including defendant's ownership of 288 shares of stock in the Marshall Packing Company. Citations of court decisions of alimony awards do not aid much in determining the proper award in a particular case. We mention a few decisions indicating the award of the able and experienced trial court is not out of line. See Doolittle v. Doolittle, 166 Iowa 625, 147 N. W. 893; Closz v. Closz, 184 Iowa 739, 169 N. W. 183; Barr v. Barr, 157 Iowa 153, 138 N. W. 379; Arment v. Arment, 154 Iowa 573, 134 N. W. 616; Moore v. Moore, 192 Iowa 394, 184 N. W. 732; Davison v. Davison, 182 Iowa 1116, 165 N. W. 44; Meyer v. Meyer, 187 Iowa 617, 174 N. W. 356; Goodrich v. Goodrich, 205 Iowa 1096, 216 N. W. 609; Schneckloth v. Schneckloth,

209 Iowa 496, 228 N. W. 290; Kitchen v. Kitchen, 238 Iowa 582, 27 N. W. 2d 901.

There was some disregard of our rules in the presentation of the appeal. The printed record was greatly lengthened by many pages apparently copied direct from the transcript, and by setting out other matters verbatim. All of which could have been narrated on a few pages without harm to the appeal. North Western citation of Iowa decisions should be given.

The decree is—Affirmed.

MULRONEY, C. J., and OLIVER, HALE, GARFIELD, MANTZ, SMITH, and HAYS, JJ., concur.

## SUPPLEMENTAL OPINION

PER CURIAM.—Petition for rehearing is overruled with supplemental opinion.

Petition for a resubmission of this case is denied. But to comply with an order made by this court on April 7, 1947, which was overlooked, the decision and opinion of the court announced on February 10, 1948, affirming the judgment and decree of the district court is changed and modified as herein set forth.

On April 7, 1947, an order was made by this court upon plaintiff's application wherein defendant was ordered to pay plaintiff the sum of "$200 per month support money pending the final decision of this cause on appeal" and said order further provided, "said amounts" were "to be considered by this court in connection with the award finally made by this court." As stated this order was overlooked at the time of our original opinion in this cause and we learn from the petition for rehearing, and it is not denied in the resistance, that the sum of $2,000 has been paid by defendant to plaintiff under said order. The former opinion in this court is modified to grant defendant a credit in the sum of $2,000 upon the award made to the plaintiff by the decree of the trial court, which award was affirmed by our opinion in this case.

That part of defendant's petition for rehearing asking to be absolved from the payment of interest upon the award

to plaintiff is denied. The award shall draw interest from the date of the decree of the trial court as by law provided.

That part of defendant's petition for rehearing seeking a further credit in the nature of rent for plaintiff's occupancy of defendant's house during the pendency of the appeal is also denied.