OTTO BARTELS, appellant, v. MARIE BARTELS, appellee.

No. 48638.

(Reported in 69 N.W.2d 41)

MARCH 8, 1955.

REHEARING DENIED MAY 6, 1955.

J. A. Williams, of Council Bluffs, for appellant.

Roy W. Smith, of Council Bluffs, for appellee.

BLISS, J.—The decision of the suit troubled the district court, and the appeal presents difficulties to this court. The parties had an irrepressible inclination to disagree with each other and also with their respective attorneys. J. Leo Connolly drew the petition. Addison C. Kistle was associated with him in the trial. The decree was filed February 6, 1954, and J. A. Williams filed the notice of appeal on the 15th of that month and has presented the appeal for plaintiff.

Hugh P. Finerty filed answer for defendant but was discharged without pay about October 9, 1953, and Roy W. Smith was then retained, and represented the defendant in the trial court and presents the appeal for her here.

The petition was filed January 2, 1953, the answer on the 23rd of that month, and thereafter there were amendments,

pleadings, applications, orders, injunctions, hearings in the district court and two hearings in this court. Trial was had on January 12, 13, 14 and 15, 1954. Decree was prepared on February 4, 1954, and submitted by the court to the attorneys of the parties for approval. The decree was filed February 6, 1954, and on it appears the following: "Approved: J. Leo Connolly, Addison C. Kistle, Attorneys for Plaintiff; Roy W. Smith, Attorney for Defendant." The appeal by plaintiff was perfected as above noted. It is stated in appellee's brief and argument: "Consultations between attorneys and clients were very many and very lengthy. A half dozen serious efforts were made from time to time to settle the litigation. But the clients stood their ground."

The trial court in its "Findings of Fact" reviewed the evidence at length, and in the eighth finding it said: "This marriage is ended. Who is at fault is impossible to determine. Both parties have established beyond question that great friction developed between them and they should be divorced from each other."

After further findings the court stated: "It is therefore *ordered, adjudged and decreed* that the plaintiff and defendant are divorced and the bonds of matrimony heretofore existing between Otto Bartels and Marie Bartels be, and the same are hereby dissolved * * *." The decree then continues with provisions for property division and attorney fees.

It will be noted that the divorce provision, set out above, does not expressly provide to which party the divorce is granted. The plaintiff was the only party praying for a divorce. Defendant not only did not pray for a decree of divorce to herself, but she resisted the granting of a divorce to plaintiff. But, as noted above, defendant did not appeal, and plaintiff, who prayed for a decree of divorce, appealed, notwithstanding the decree divorced the parties. It is a fair assumption that he appealed, not because of the decree of divorce, but because of the property division. Plaintiff assigns as the ground for his appeal the invalidity of the decree because it does not expressly state the party to whom the divorce was granted. He also argues the inequity of the property division. Before discussing this point

we will refer to the pleadings, and to portions of the evidence, which are typical and fairly indicative of the tenor of approximately 125 pages of testimony narrated in the printed record. It is impossible to summarize it within reasonable limits, and we can state only our conclusions after a study of the record and briefs and arguments presented.

The prayer of plaintiff's petition, in conformity with the allegations, is that he be granted an absolute decree of divorce from the defendant on grounds of cruel and inhuman treatment endangering his life and health. Defendant's answer denied the allegation of the petition charging such inhuman treatment and prayed that plaintiff "be not granted a divorce, and that his petition be dismissed at his costs, and that this defendant be granted further and general equitable relief as the court deems proper."

Plaintiff's petition also alleged: "That during the marriage of the parties, plaintiff has accumulated considerable real and personal property and that this plaintiff is willing to make some reasonable property settlement or make some provision for the payment of permanent alimony and is likewise ready to make child support payments for the said minor child [Rudy Bartels] until he becomes self-supporting or graduates from high school."

On November 13, 1953, defendant filed her cross-petition alleging that since the date of the marriage of the parties the plaintiff had treated her with cruelty of such nature and so inhuman as to endanger her health and life, and also alleged that her labors and efforts had substantially aided in the acquisition of the property held by plaintiff and this defendant; the plaintiff *and the defendant* built a home, a duplex and an apartment house and other buildings on a tract of ground consisting of four lots located in the western portion of Council Bluffs, Iowa, on Third Avenue, described as "Lots 9, 10, 11 and 12, Block 30 in Ferry Addition to the city of Council Bluffs", and that the parties are the owners of other real and personal property reasonably worth $75,000.

The prayer of defendant's cross-petition was that the court grant her a decree of separate maintenance from plaintiff and that the properties of the parties be left in a condition of status

quo under management of defendant until such time as an equitable division thereof can be made, and that plaintiff be required to contribute a reasonable amount monthly toward the support and maintenance of the defendant and that she have other and further relief as to the court seems just and equitable.

In plaintiff's answer to the allegations of defendant's cross-petition he stated: "Plaintiff admits that the parties to this action have accumulated certain property consisting of both real estate and personal property, but plaintiff denies that this property is reasonably worth $75,000, and states that all of the property, both real and personal, is not worth more than $50,000, and that the mortgage indebtedness of $7000 [on the duplex] as stated by defendant is substantially correct, and that the parties owe other debts of approximately $1000, which would leave a net equity of about $42,000." The answer denied the allegations of the cross-petition for separate maintenance.

The parties were born in Germany and became acquainted at Lehrte, near the city of Hanover. He was 21 and she was 25. She was sewing in a factory at that time. He was a pastry cook in a bakery. She described him as "an accomplished pastry-man. When he said that at one time, when he was 19 years old, he had a crew of over 30 men under him in a big bakery there, that is right. He was a fine, handsome looking young man." They "went together" nine months before he had a desire to come to the United States. Relatives financed his passage here in 1926. She testified: "I had something to do with trying to help him to save money to come over here. We didn't go anywhere and he didn't get anything. He was always sitting in his room and I would do his sewing—sew on buttons and embroider his name on all of his clothes. I stayed home in his apartment, and when he left he promised he was going to send for me and marry me. He wasn't in this country very long until he sent for me."

Immigration regulations delayed her coming for a year. She landed in New York on April 7, 1929, and reached Council Bluffs on April 10, 1929.

When plaintiff reached this country he went to the home of his mother's brother at Blanchard, near Shenandoah, Iowa, and then obtained a job as pastry chef for Peter Pan, and Bran-

deis Department Store in Omaha. On December 26, 1928, he contracted to buy a three-room house on one of the lots in Block 30 of Ferry Addition, above referred to, and made a down payment. It was just a frame house without a basement, toilet or bath facilities. He moved in and immediately started to improve it by building a kitchen and bathroom and making sewer connections, but had not finished them when Marie arrived. Otto met her at the train and took her by taxi to his home. He told her he had just two hours off from his work. She asked him if he planned to marry her, and when he answered, "No, not right now", she said, "I'm going back home." She testified: "That happened most every day for a couple of weeks. * * * but then he got a license on April 26, 1929, and he told me we were married. I believe him. I wrote to my mother and she said you better go—she wouldn't like that we go to the courthouse and get married, we better go to the minister and get married. She would like that a lot better. We finally got married by a minister in Omaha on May 23, 1929—after I got this letter from my mother. I called his attention to it and he finally got some persons who were witnesses to our wedding."

She at once joined Otto in the labor of improving the little home. She testified: "He had started already before I came over. He had the sewage already and I think he had the foundation dug and he had lumber there and he always told me I had to pull the nails out and I pulled all the nails out of the old lumber and tried to help him in any way I could. I helped him carry cement and did what I could. He mixed the cement outdoors and I took each bucket of cement and he filled the sides in the basement. He filled that in and he had to board it and put cement behind it. He mixed it and I carried the cement to him. He dug the basement under the house. He was plastering up the dirt walls with cement and he cemented the dirt floors at that time. I helped him with the two-by-fours in the building. He put twenty-six two-by-fours together and we lifted them up on both sides on the blocks. I helped him with everything." Marie was a strong, healthy woman. She weighed 150 pounds when she left Germany.

In October of 1929 Otto stepped on a rusty nail and was

in the hospital for some time with blood poisoning. She called on him daily. When he was dismissed from the hospital and went home, the doctor told her to bathe Otto's foot with a hot Epsom solution. She testified that when she did so he pulled her hair, swore and cursed her and called her names—"I don't like to repeat them in court." When he was able to work he was nailing some flooring, and she went up to put her arms around him, he elbowed her away and she fell between the two-by-sixes to the basement floor and two of her ribs were broken. She testified that he never wished them to have any children, and when she first was pregnant he asked her to get rid of it. The first child, Otto, Jr., was born August 20, 1930. Rudy, the second child, was born June 12, 1935. She testified: "His attitude toward the children never was good—at least not to the oldest one." There is corroboration for this. Rudy was a witness for her. The older boy, Otto, Jr., saw service in the Navy. He was home on a furlough in 1953, and neither he nor his father made any effort to see the other. Some of the quarrels between the parents arose when defendant interfered in his abuse of the children. She testified that Otto would kick them "where they would be injured for life—between the legs."

Otto lost his job with Brandeis in 1931. She testified: "A detective came home one morning with Otto. He claimed that he took some merchandise home with him. They never prosecuted him for it but he was released from work. Notwithstanding that I stuck with him. He didn't have a job. In March he got work in Sioux City for six weeks. That was about the beginning of the depression." Otto worked at the Ambassador Cafe in Omaha from November 1931 for five years. In 1936 he operated a bakery for himself for seven months. She testified: "I helped him in the back part and helped in front and peddled bakery goods in the neighborhood. I served the customers in front. I took the merchandise with me when I peddled it, in a basket. The thing that caused the business to fail was that we trusted people sometimes, with checks and everything, and my husband did not make enough to make it go. He couldn't buy any merchandise any more. * * * We went back to our house in Council Bluffs. It was not rented."

After the business failed, Otto had no regular work, just odd jobs, and they went on relief—W.P.A. Defendant testified that she took in washing and went out and did washing: "I tried to get some outside work. I did housework. That was in 1938. I worked days and by the hour. I took Rudy most of the time with me. * * * I always tried to help in every way I could to save and make money. At first I worked for twenty-five cents an hour. During those years my average earnings from work were from four to six hundred and fifty dollars. I used that money whenever we needed clothes and something for the house and I helped my husband in lots of ways. I gave him money for gasoline going to Omaha, and all kinds of things that had to be done where he didn't have the money, I helped out. All the money that I earned went to supplement the family income, to pay for the necessities of life and clothing or to help Otto when he needed some money. I was able to save something for myself. Last year I had $500 in the bank, that I saved. In recent years Otto has never bought any clothing for the children. He quit doing that a long time ago. When the kids needed something I bought it. That was the situation for many years. I bought most of their clothing. * * * Rudy was ten years old when he started with a paper route. Since that time his father has not bought him any clothing to amount to anything. The boy used his earnings to help pay his way through school—I provided with the rest. I am still taking in washing. I kept records of all the money that I handled since 1941. During 1953 my earnings were $407.15. I earned that by washing and ironing. I got seventy-five cents an hour with my electric and everything. I don't go to other people's houses to wash now—haven't done that for the last few years because my health broke down and I couldn't. * * * My earnings in 1952 were $469.70. In this book it shows where all that money went. There are no other years in there except 1951 and 1952—in 1951 I earned $654.05. * * * During all these years I bought my own clothing and all the other things a woman would want and during the same time I took care of my own housework at home and the children; got all of the meals and I hope I am a good housekeeper. Sometimes it isn't just as it should be but I clean it. * * * As Otto has said from

time to time he enlarged the house and his statements to that effect are correct. \* \* \* Otto was always starting some remodeling work but never finished it and each time he had it started and before he had it finished, he started all over again. He never had the first part finished. It kept the house always upset. There never was any accumulation from dirt and dust from time to time from his tools. He took that out but the walls were bare and this wasn't right and that wasn't finished. He always left it before finishing it and I sure would talk to him about it. I felt that was a woman's right \* \* \* to have a perfect house to live in and not just always to be broken up. Windows soiled. No woodwork. If there was a will, he could have finished it."

During World War II Otto was employed in Government construction work steadily. They put their earnings in a joint bank account. It was while he was doing this work that he determined to engage in contracting building construction. He used his savings in assembling the needed equipment. In 1945 he built a workshop on his lots. Of his ability, Marie testified: "Otto is a wonderful carpenter and was fairly successful from the start. He was so successful that since he started out from scratch, you might say, in 1945, he has built all of these buildings and the property down there on these premises. At times he had as high as four or five men, building houses, doing all kinds of contracting work." He put a second story on the carpenter workshop and built three living apartments there, the first of which was rented in February 1949 and the other two were completed in May 1950. The monthly rentals for the three are $226. She attends to the leasing of them and the collecting of rent, and their upkeep. She said, "they are nice looking and I keep them that way and I have been after my tenants to keep them that way." When there is a vacancy she and Rudy repaint the apartment. When the apartments were completed, Otto began building a duplex. The first half of the duplex was completed on April 4, 1952. Of the completed building, she testified: "It is a very fine, modern building with full basement and two separate heating units and two hot-water heaters." Each of the two apartments rents for $90 a month. The tenants are furnished with all kitchen equipment, including electric stove,

frigidaire and cabinets, but pay for all utilities except water. The defendant attends to the leasing of the duplex and collecting the rent. In the late summer of 1952 Otto built a large cement block garage back of the duplex. Marie had opportunities of renting it for $5 a month for each section, but Otto insisted on $10, and it has remained empty.

In 1948 or 1949 Otto built a large storage building, 24' by 40', which he uses for building material. Defendant kept the books in Otto's business undertakings.

She testified: "Referring to our present trouble, Otto has struck me on various occasions during recent years. The last time he hit me was May 4, 1948. He was in the shop and accused the older boy of breaking a piece out of his grindstone. The boy said he didn't do it and he hit the boy to the floor and I took him off on it and not to hit the boy and he hit me and bent my glasses. I had a bloody nose and bloody mouth because I was trying to protect the boy. He abused the boy and hit him in the face and kicked him between the legs. He has a wild temper. He gets snow-white when he loses his temper. It is just awful. And then he walks away. He screams and hollers when he blows up. He seems to lose control of himself and curses and swears. He never did try to correct the boys by talking to them. He threw things at them. He threw a hammer at the older boy, when he was 7 or 8 years old, and hit him in the back and made a mark bigger than a ball, and that is where I tried to intercede."

Otto, Jr., wrote letters to his father while he was in the Navy, but his father never answered. When he was returning to service after a furlough, a neighbor telephoned and asked why the boy and his father did not see each other. His mother told the boy to go into the carpenter shop and see his father before he left. He did so, but when the boy asked his father why he treated his mother so his father "told him to get out and stay out and never get your face around here any more. He said that to Otto, Junior, and I said to him you sure are a nice dad. Your boy is fighting for you and you are going to kick him out of here. You should be ashamed of yourself."

On June 6, 1953, plaintiff amended his petition and prayed

for an injunction against defendant, aided and abetted by the two sons, restraining them from telephoning him and then hanging up the receiver, and restraining her from collecting the rents. The allegations were denied and plaintiff was charged with committing depredations on the property and disturbing the tenants. Judge Roe of the district court directed each to refrain from molesting the other, and ordered defendant to take charge of the duplex and the apartments and the grounds, and charged the defendant with the collection of all rents and the proper accounting therefor, with the right to use a reasonable portion of such funds for her support and maintenance until the trial of the action, and deferred plaintiff's application for a receiver.

On July 22, 1953, plaintiff filed a second amendment to his petition alleging that since his petition was filed defendant and the sons had endangered his life and health by entering his shop and "pushing" him and threatening his life, and harassing him by taking some of his tools.

On October 9, 1953, plaintiff filed another application for the appointment of a receiver to collect the rents, on the ground that defendant did not properly use nor account for the rentals. We find no record of any hearings or rulings on these pleadings.

Plaintiff testified that the family discord began early in World War II when he began to receive good wages in Government construction work. During that time he saved $3000, or more, all of which he delivered to his wife to put away and save. It was at this time that he began planning to go into the construction business as a contractor instead of as a wage earner, and he wished to use his savings for that purpose. But his wife was insisting on improving the home and making it more livable. To appease her he started different improvements on the home which he was delayed in completing or which he never completed because he needed the money in his building ventures if he was ever going to succeed in it. This matter was a never-ending source of quarreling and friction. She was complaining of undone work in the bathroom at the time he left the home in early December 1952.

Another source of discord was the fact that she did the book-work and was familiar with the facts in each business venture, and she thought she knew better how the work should be done and the business conducted than he, and she repeatedly told him so. When he had a telephone installed in his workshop an extension line was run to the home, so that when a call came in the telephone rang in both places. She invariably listened in and oftentimes injected herself into the conversations and frequently disagreed and disputed with him during the call. These were business calls and he was caused much embarrassment. In many of the building and remodeling jobs the wife of the employer was as much or more interested than the husband and frequently telephoned plaintiff about the work. Marie listened in and thereafter would accuse him of a fondness for various wives and of intimacies with some. These matters were a basis for contention frequently, when he was at home—so much so that he went to his workshop after the evening meal and worked until near midnight in making various types of woodwork for building purposes. He was an excellent woodworker and cabinetmaker. But he was not able to escape even in his shop, for Marie frequently followed him over. He testified that his wife became cold and indifferent and refused to have sexual relations with him. She testified to such indifference on his part. Much of the time he slept on the sofa.

He became very nervous and unstrung which brought on severe digestive trouble. He was able to work for but a short time each day. He finally gave up attempting to work and during the year 1952 he had scarcely any work. On December 10, 1952, he was asleep on the sofa. His wife had not retired, and when Rudy came home rather late he went over and roughed his father up somewhat. Plaintiff then got up and left the home not fully dressed and never thereafter stayed there. His weight had dropped to 154 pounds at that time. He rented a small apartment and lived there and prepared his own meals. He left his wife in possession of all of his real-estate property and she collected the rentals and gave him no part of them. He spent considerable time in the home of Ernest Nagunst who had known him for ten or more years. When he first came to the Nagunst home after leaving his own home he was very much disturbed

mentally and nervous and exhausted physically and seemed on the verge of a breakdown. He would sit down for a few minutes and start trembling and get up and walk restlessly about. He had lost much weight. He called at the Nagunst home daily for several days and ate his meals there. He was going to help Mr. Nagunst do some work on the latter's basement, but he was so nervous he was not of much help and after working about two hours he had to quit. The longest he was able to stay was about a half a day at a time. Gradually he became more relaxed and after a few months his upset and nervous condition was much improved. Nagunst as a witness for plaintiff testified that in the previous six months Bartels had gained thirty pounds or more, and was about back to his accustomed weight. Nagunst had been in the Bartels home at different times and spent many hours there. On several occasions he heard Bartels and his wife arguing, mostly about family affairs. She did most of the talking. It was of a nagging character. Most of it was about things she wanted him to do which he could not do, things which it was impossible to do and also do his contract work. She would accuse him of not knowing what he was doing. The witness heard her accuse him of running around with and of being too intimate with other women in his business. On one occasion Mrs. Bartels and Rudy came into the shop and began an argument with Mr. Bartels and Rudy threatened to whip him and said " 'I ought to kill you.' " It seemed to the witness that Mrs. Bartels was there just to cause trouble. Bartels appeared to have aged very much in the past few years, and it was the opinion of the witness that his changed physical condition was due to the domestic situation and the trouble he was having at home.

It is our conclusion that under the record the plaintiff amply and definitely established that the inhuman treatment which he received from the defendant endangered his life and clearly entitled him to a decree of divorce from her.

It is our further conclusion that this is not an action where the parties were equally guilty, and that under the doctrine of recrimination neither was entitled to a decree of divorce, as was the holding in Paulsen v. Paulsen, 243 Iowa 51, 50 N.W.2d

567, and Kentzelman v. Kentzelman, 245 Iowa 579, 63 N.W.2d 194. Defendant failed to establish that plaintiff was guilty of such inhuman treatment of her as to endanger her life. It is true that his mistreatment of her and of the children was mean and reprehensible in several respects, and inhuman, but that is not sufficient to entitle her under section 598.8(5), Codes of Iowa, 1950 and 1954, to the relief she prayed for. The treatment must have been not only inhuman, but to such an extent and character "as to endanger the life of his wife." The treatment she received was not of that character. Prior to the divorce proceedings begun in January 1953 the last time he hit her was on May 4, 1948, when he broke her glasses and caused her nose to bleed. That was almost five years before the home was broken up. After the court proceedings were started there were some childlike molestations of property by each, but there is a lack of worth-while evidence that her life was ever endangered by Otto's mistreatment. Her physical, mental and emotional being was of stronger and more resilient fiber than was Otto's. She was never broken or even bowed by his conduct. It is true that her health became impaired by diabetes and she suffered from a protracted menopause, but neither was caused by anything done by plaintiff.

She did not establish the allegations of her cross-petition nor was she entitled to the relief for which she asked. But under section 598.14, Code of 1950, the court could make such order in relation to the property "as shall be right." It did render a decree of divorce. And it is mere quibbling to argue that the divorce was not granted to the plaintiff. He alone prayed for a decree of divorce. He alone was entitled to it. The decree dissolved the bonds of matrimony previously existing between them, and restored to each of them the rights of unmarried persons, and is necessarily effective as to each of them.

The buildings on Lots 9, 10, 11 and 12 in Block 30 of Ferry Addition to Council Bluffs, Iowa, were constructed without regard to their overlapping the lot lines, and the court found "that the only equitable division which can be made of the buildings on the Lots * * * (describing the four above-noted) without seriously affecting the resale value of these particular

properties, is to divide them from North to South through the center of Lot 10; * * *." The court divided the four lots in said Block 30 in that manner and decreed the home and household goods and the apartment and furnishings to the defendant. The evidence fairly shows the reasonable value of the home to be $7500 and the reasonable value of the apartment building to be $11,000—total value of $18,500.

To plaintiff the court decreed the following property, with the value of each as fairly indicated by the evidence: the duplex ($18,500), the cement block garage ($2000), the storage warehouse ($2000), tools and building equipment ($2500), one vacant lot other than the four above-described ($600), and a vacant business lot on Broadway with a 44-foot frontage ($4400), a Hudson car ($250), an International truck ($450) and building supplies ($800). The values of the last three items are as estimated by the defendant. He also testified that he had refused an offer of $20,000 for the duplex, about two or three years ago. There was evidence that lots on Broadway were worth approximately $100 a front foot. Plaintiff testified that his tools, machinery and building equipment cost him $5000. The court found that there was $6624 owing on the mortgage on the duplex. Plaintiff estimated his other indebtedness at $1000. Subtracting this indebtedness from the aggregate values of the properties awarded plaintiff makes their net value approximately $24,000.

While the acquisition of the property distributed was in larger part by the efforts of plaintiff, the defendant was industrious, perhaps beyond the call of duty, and contributed substantially in acquiring and conserving it. She was 52 years old and four years older than he at the time of the trial, with her health and ability to work much impaired by diabetes. She has the younger boy with her. His schooling ended with the high school. He is entitled to further aid from each parent, in school or other training, to better fit him for the future.

The court found that the net income to defendant from the property received by her would be $1165 annually, and insufficient to provide a living for her and proper medical care and attention, and therefore decreed that plaintiff contribute $75

a month support to her, commencing February 15, 1954, and to continue as long as she remains unmarried.

The record shows and the trial court found that the attorneys for plaintiff and for defendant spent a great amount of time and effort in behalf of their respective clients, and vigorously and ably represented them, and rendered services entitling them to substantial compensation, and that a reasonable fee for his attorneys from plaintiff would be $2500, for which amount the court rendered judgment against plaintiff and declared the same to be a lien upon all the real estate granted to him by the decree. The trial court made like findings for Hugh P. Finerty and Roy W. Smith, attorneys for defendant, and rendered judgment in favor of said attorneys and against the defendant in the sum of $2500, and made the judgment a lien against the real estate awarded defendant in the decree.

It is our conclusion that the judgment and decree, in all its provisions, should be and is affirmed.—Affirmed.

WENNERSTRUM, C.J., and GARFIELD, OLIVER, MULRONEY, HAYS, THOMPSON, and LARSON, JJ., concur.