DOROTHY R. PHILLIPS, appellee, v. HARVEY H. PHILLIPS, appellant.

No. 50035.

(Reported in 104 N.W.2d 832)

September 20, 1960.

Haupert, Robertson & Johnson, of Marshalltown, for appellant.

Lundy, Butler & Wilson, of Eldora, for appellee.

THORNTON, J.—Plaintiff-wife brings this action for divorce and defendant cross-petitions for a divorce. The trial court granted plaintiff a divorce, custody of one of three children, alimony in the sum of $25,000 plus $100 per month for three years, and $75 per month for the care, support and education of the one child. Defendant was awarded the custody of two children and there is a provision for visitations by both parties.

Defendant appeals contending plaintiff has not proved the allegations of her petition, the trial court erred in awarding custody of the one child to plaintiff, the award of alimony is too large, that he was entitled to a divorce on his cross-petition and the doctrine of recrimination should be applied to the facts in this case. Plaintiff cross-appeals for custody of the two older sons and for an increase in the awards for alimony and support.

The parties were married November 6, 1942, in Omaha, Nebraska. At that time they were both residents of Marshalltown and have lived their married life there until plaintiff moved to Hardin County and commenced this action July 24, 1959. Defendant operated the Studebaker Sales & Service Dealership in Marshalltown since 1931, except for the time he spent in the Navy during World War II. During that period plaintiff operated the garage. Three sons were born to the parties, John, November 4, 1946, Harvey II, December 31, 1948, and Robert on December 11, 1950. The defendant has accumulated $68,500 worth of property.

I. Plaintiff's action is based on section 598.8(5), Code of Iowa, 1958, which provides that a divorce may be decreed against the husband "When he is guilty of such inhuman treatment as to endanger the life of his wife."

It is necessary that both elements appear, inhuman treatment and it must endanger the life of the wife. Many and varied fact situations have been presented to this court but we do not find any and none has been pointed out to us with an identical fact situation. The problem for our determination is whether the fighting, quarrels, ridicule and an indefinite amount of physical abuse add up to such inhuman treatment as to endanger life. Bowles v. Bowles, 248 Iowa 930,

933, 81 N.W.2d 15, 16, 17. The danger to life is sufficient where the danger is reasonably apprehended. Weatherill v. Weatherill, 238 Iowa 169, 25 N.W.2d 336. We have held failure of health and loss of weight together with a restoration of health and weight after a few months of separation tend to establish that the conduct of defendant was inhuman and endangered life and when shown by testimony other than her own may serve as corroboration. Bouska v. Bouska, 249 Iowa 281, 86 N.W.2d 884. In Brown v. Brown, 248 Iowa 802, 82 N.W.2d 661, we held where the plaintiff-wife was a victim of tuberculosis and her condition was merely retarded by treatment at the sanatorium at·Oakdale the extreme profanity and threats of defendant had a more serious effect upon the plaintiff than they would have on a normal person and were sufficient to entitle plaintiff to a divorce.

██ ██  In the record before us we have a plaintiff who is nervous and emotionally disturbed and we agree with the trial court the treatment she received from defendant was inhuman and endangered her health and life under the circumstances of her mental health. We believe defendant's acts and conduct had a much more serious effect on plaintiff than they would have had on a normal person.

The pertinent facts arose during the last months the parties lived together. However a brief review of their married life is necessary. During the first ten years of the marriage defendant spent two years in the service and the children were born. During this period they termed themselves "social drinkers." Starting in 1952 plaintiff's drinking increased. She testifies:

"* * * From 1952 on, I bought my own liquor or had friends get it for me. I hid the bottles about the house from that time on. * * * I knew he would disapprove of my drinking that heavy if he knew about it. * * *."

The situation in the home became deplorable. Plaintiff was unable to handle the children or the home. Plaintiff's mother came to live with them for a two-year period before she was committed to Independence. Nevertheless with full knowledge of her condition defendant continued to bring liquor home and drink with plaintiff. It is fair to say he enjoyed drinking with

plaintiff and requested her to do so. There is no evidence he insisted on her doing so. Plaintiff's drinking became so bad a hearing was held by the Commission of Insanity of Marshall County at the instance of defendant. This first hearing was in February of 1957, it was continued and then dismissed. The commissioners advised both parties plaintiff should not have access to liquor and to seek the help of Alcoholics Anonymous. Defendant took plaintiff to two AA meetings but she refused to join or use this help. At the same time defendant continued to bring liquor into the home and drink with plaintiff. In June of 1957 a second hearing was had before the Commissioners of Insanity and plaintiff was committed to the Mental Health Institute at Independence. We do not find, as urged by plaintiff, defendant deliberately set out to force plaintiff to become an alcoholic. The defendant acted unwisely and the record bears out her claim he was a man with a mean disposition.

Plaintiff was released from the Mental Health Institute September 27, 1957. Defendant drove to Independence to bring plaintiff home. Shortly thereafter plaintiff quit drinking and defendant has not brought liquor into the home.

The record displays a course of dominance and ridicule carried on by defendant in their family life. Many of her complaints are denied or explained by defendant. This much is clear from his own testimony. He told the boys their mother did not like him. He told them if their mother disagreed with him on any form of discipline that his word was to control. Discussing this matter he states: "I expected that to set her pattern and I expected it to be followed. In a situation such as that, my word is as good as I know of, yes." Plaintiff complains he ridiculed her in front of the children and was vulgar in his approach to her, this also in front of the children.

March 4, 1958, plaintiff started a divorce action in Marshall County. Defendant was restrained from coming on the premises or molesting plaintiff or the children. This action, after plaintiff had testified, was dismissed with prejudice. We are not advised what prompted the dismissal.

The parties resumed living together. Plaintiff says when defendant moved back he said, " 'Well, let me tell you some-

thing, sister, if you think you have had it tough in the past you haven't seen anything yet.' " Defendant's version of his homecoming was entirely different. However, in matters of this kind where the credibility of witnesses is concerned we rely on the trial court. The court had the advantage of observing the witnesses to determine the real truth of the matter. Brown v. Brown, supra. This is particularly true when a course of conduct is followed that tends to show a definite mean disposition toward plaintiff.

The following stand out from defendant's own testimony. He says he chastised her. He says he did this by talking to her about her conduct. This was mostly in relation to the children. This happened at least two or three times a week. Because plaintiff charged some work done at the beauty shop, he not only made a scene, he called the beauty shop and told them to look to her individually for payment and he, for the second time, sent letters to a great number of local merchants to the effect he would be liable only for charges authorized by him. This was in January of 1959. In July of 1957 when plaintiff was in the Mental Health Institute defendant had done the same thing. Under the circumstances in 1957 there may have been some excuse for such letters. In January of 1959 we see no excuse. Plaintiff was not drinking and there is no evidence her spending was so large as to warrant such a step. It could only serve to publicly embarrass and humiliate plaintiff. This happened after defendant is chargeable with knowledge of plaintiff's nervous and emotional condition. On December 2nd and 14th in 1958 the parties had two conferences with John Meyer, M.D., a practicing psychiatrist in Cedar Rapids. He advised defendant to be kind and considerate and more generous and helpful to her because she was still in need of further improvement. The doctor also advised plaintiff along the same lines in her conduct toward defendant. If defendant was not aware his wife was nervous and emotionally disturbed before these conferences he cannot claim so afterwards.

Prior to these conferences there is evidence of physical violence. Without attempting to determine who should be allowed to watch their favorite television program, we can say a husband

should not wrestle or scuffle with his wife over changing the channel to the extent of leaving black-and-blue marks on her face and arms. There is evidence of at least two other encounters before plaintiff left in July of 1959.

During this period the affections of the boys became split. The two older boys sided with their father and the younger one with his mother. This does not happen unless the discord in the family is great.

To corroborate her version plaintiff introduced the evidence of a next door neighbor, testifying by deposition because of ill health. This neighbor testified defendant's reputation in the community is that he is a mean person. He also testified, in the only conversation he had with defendant, and they were next door neighbors, defendant said, " 'I am going to get rid of her if it is the last thing I ever do.' " The witness said this occurred after plaintiff's return from Independence. In 127 pages of testimony on his own behalf defendant did not deny the statement attributed to him.

When asked on cross-examination if he ever had any occasion to doubt the plaintiff's fidelity, he testified, "I have not testified to an infidelity of my wife. There is some question about her faithfulness. I was not suspicious about my wife, but I was cautious. * * *."

In testifying by way of discovery deposition concerning his wife's cashing an insurance check apparently made out to their oldest son, in answer to a question as to what he did about it, defendant said, "All I could do was tell her what a dirty low-down trick I thought it was. Sure I could have strangled her probably." On a later occasion he wired a car switch so plaintiff's key would not work in it. He testified he lost his love for her after she left in July of 1959 but that he had nothing against her as a woman.

The foregoing show defendant's attitude toward plaintiff and corroborate her version of the ridicule, harassment and mental abuse heaped on her during the seven and one-half months from the dismissal of the Marshall County action until she left in July.

As to plaintiff's condition of health there is no dispute.

Doctor Meyer in addition to seeing plaintiff on the two occasions mentioned above was clinical director at the Mental Health Institute at the time of plaintiff's commitment. At that time he diagnosed her as an emotionally unstable personality with the complication of alcoholism. At that time he says she was very definitely sick. In November 1958, at the time of the trial in Marshall County, she had improved moderately and at the time of this trial improved substantially, "* * * is about 85% well today."

Doctor Meyer also explains the causes of mental illness are many and multiple. The eight-year courtship and incidents of it and drinking heavily were the more important factors, but the quarrels, friction and ridicule which occurred during marriage were obviously additional factors. Naturally, we do not place blame upon defendant by reason of the courtship or early drinking or find that he caused plaintiff's condition. The question is, is his conduct such as to endanger life with the degree of sickness now suffered by plaintiff?

The doctor testified her improvement was good and that it seems likely that being separated from her husband gave her an opportunity to help herself more than when she was with him. As to her prognosis, if given a favorable setting he thinks she will continue to improve and stay well the rest of her life. The doctor explained a favorable setting as one where she would not be given a hard time, reasonable financial security, good relationship with her child or children, a reasonable amount of fun in life, a balanced life with nothing damaging going on day after day. There is additional evidence her condition is improved since the separation.

It is our holding, under the circumstances presented, the ridicule, humiliation and embarrassment to which plaintiff was subjected by defendant will if continued endanger her health and life, and the decree of the trial court granting plaintiff a divorce is sustained by the evidence.

II. We do not find evidence plaintiff was guilty of such conduct as to endanger the life of defendant. This disposes of both defendant's cross-petition and his claim the doctrine of recrimination should be applied to the facts in this case. Paul-

sen v. Paulsen, 243 Iowa 51, 50 N.W.2d 567; and Kentzelman v. Kentzelman, 245 Iowa 579, 63 N.W.2d 194.

▅ III. An examination of the entire record sustains the trial court in awarding the custody of the two older boys to their father and the youngest one to his mother. From the facts known now this appears as the best solution. However, due to the father's practice of taking the sons on fishing trips and to baseball games which take them out of Iowa, the portion of the decree providing for visitations during the months of June, July and August is hereby modified to allow either party to take the three sons on educational or recreational trips out of Iowa, and to places outside of the city of their residence within Iowa during such months upon advising the other party of the time of leaving and returning and destination of any such trip.

▅ IV. Upon an examination of the financial situation of the parties, the responsibilities resting upon them and apparent contribution of each to the property accumulated we hold the lump sum alimony award to plaintiff of $25,000 as provided in Item 6 of the decree should be and is hereby reduced to the sum of $20,000, said sum to be paid within 30 days after issuance of procedendo herein, and the monthly payments of $100 per month provided in Item 8 of the decree are hereby eliminated. We hold the amount allowed for the support of the youngest son adequate.

V. Plaintiff's application for allowance of attorney fees for services performed in this court was ordered submitted with the case. Fees in the sum of $750 are hereby allowed plaintiff for her attorneys for services rendered in handling this appeal. Costs are taxed to the defendant.

The decree of the trial court is modified as to extent of visitation rights and alimony payments, in all other respects the decree is affirmed, and is remanded for a decree in conformity with this opinion.—Affirmed in part, modified in part and remanded.

All JUSTICES concur except OLIVER, J., not sitting.