SYLVIA C. ARNOLD, appellant, v. EUGENE A. ARNOLD, cross-appellant.

No. 51513.

(Reported in 133 N.W.2d 53)

February 9, 1965.

Richard C. Turner, of Council Bluffs, for appellant.

Kistle & Telpner, of Council Bluffs, for cross-appellant.

GARFIELD, C. J.—It is most regrettable this marriage has found its way onto the rocks. It is doubtful the divorce granted on plaintiff-wife's petition will lead to happiness for either party. It is hoped further consideration may be given the matter of reconciliation.

The record of defendant-husband's climb from a dollar-a-day laborer when married in 1935 to sole owner of an important industry, with an annual salary of $36,000 and a $7500 Cadillac for his use, at the time of trial in December 1962, reads like the nearly forgotten tales of Horatio Alger, Jr.

Plaintiff's petition alleges as cause for divorce what section 598.8, Code, 1962, designates "such inhuman treatment as to endanger the life of his wife." Much of the amended petition consists of allegations of what plaintiff thought she was entitled to as division of property, alimony, child support, suit money and attorney fees. The answer is essentially a denial. Defendant filed no cross-petition although at the close of his evidence on plaintiff's right to a divorce he asked and was granted permission to cross-petition, "to conform to the proof," for divorce on the same ground plaintiff charged against defendant. Perhaps failure to file the cross-petition was due in part to the trial court's announcement, soon after permission for the filing was granted, he intended to grant a divorce, without assigning the blame therefor to either spouse.

The decree, however, finds defendant guilty of such inhuman treatment as to endanger plaintiff's life and health and that she is a fit and proper custodian of the three minor children—twin boys, 13, and a girl, 11. The two oldest daughters had married and left home and the oldest son became 21 during the trial. While he lived at home, he is steadily employed in defendant's shop at good pay and is self-supporting.

The decree provides the parties are divorced and custody of the three minor children is granted plaintiff, subject to defendant's right to visit them at reasonable times and places. Details of the decretal provisions regarding property settlement, child support, suit money, costs and attorney fees will be stated later

when we consider these matters. Plaintiff's appeal complains principally of these provisions. Defendant's cross-appeal asserts plaintiff is not entitled to a divorce because 1) the doctrine of recrimination bars her claim thereto, and 2) corroboration of her asserted ground for divorce is insufficient. The cross-appeal also asserts the award of attorney fees to plaintiff's counsel is excessive.

I. Plaintiff first complains the decree merely divorces the parties without providing the divorce is granted to her. She thinks this may indicate the trial court recognized the doctrine called "comparative rectitude" and did not consider defendant's conduct in arriving at provisions of the decree against which plaintiff's appeal is mainly directed.

■ As previously explained, only plaintiff asked a divorce; defendant resisted it. Also the decree finds defendant guilty of such inhuman treatment as to endanger plaintiff's life. Notwithstanding failure of the decree expressly to grant the divorce to plaintiff it seems clear this is the effect of the decree. It may hardly be assumed the divorce was granted the spouse who resisted it. See Bartels v. Bartels, 246 Iowa 942, 955, 69 N.W.2d 41, 48; 17 Am. Jur., Divorce and Separation, sections 465, 574.

■ In any event, our review is de novo. Rule 334, Rules of Civil Procedure. We review the facts as well as the law and draw what we think are proper conclusions therefrom. Gilbrech v. Kloberdanz, 252 Iowa 509, 515, 107 N.W.2d 574, 578. We have concluded plaintiff is entitled to the divorce and now state it should be granted to her. To the extent we deem proper, conduct of both spouses will be considered, along with other matters, in determining division of property and related matters.

■ In view of the extent plaintiff argues this question and defendant's contention the doctrine of recrimination bars plaintiff's right to a divorce, we may add that where both spouses have grounds for divorce a divorce will not be granted to either. This is the doctrine of recrimination. Paulsen v. Paulsen, 243 Iowa 51, 57, 58, 50 N.W.2d 567, 571; Kentzelman v. Kentzelman, 245 Iowa 579, 583, 584, 63 N.W.2d 194, 196; Leigh v. Leigh, 247 Iowa 358, 361, 362, 73 N.W.2d 727, 729; Phillips v. Phillips, 251 Iowa 1310, 1317, 1318, 104 N.W.2d 832, 836.

██ ██ The principle or doctrine of comparative rectitude is in the nature of an exception to the doctrine of recrimination and is applied in a few states, mainly by statute, where it appears the parties cannot live together and a divorce is best for their general welfare. We do not recognize this principle. Paulsen and Kentzelman cases, supra. See also Blankenship v. Blankenship, 51 Nev. 356, 276 P. 9, 63 A. L. R. 1127, and annotation, 1132; Hove v. Hove, 219 Minn. 590, 18 N.W.2d 580, 159 A. L. R. 731, and annotation, 734.

We may also observe we have said it is better practice for a divorce decree to state to which party the divorce is granted, although omission of such a provision does not invalidate the decree. Oliver v. Oliver, 216 Iowa 57, 60, 248 N.W. 233. See also Ackel v. Ackel, 57 Ariz. 14, 110 P.2d 238, 133 A. L. R. 549, and annotation, 556.

II. Since, as stated, defendant's cross-appeal challenges plaintiff's right to a divorce, it seems best to consider that question next. We have already said we think she is entitled to the divorce. The principal rules of law applicable to this phase of the case are so well settled it is perhaps unnecessary to restate them. In any event, extensive citation of supporting precedents is not called for.

To be entitled to a divorce under Code section 598.8(5) plaintiff was required to prove 1) inhuman treatment by defendant, and 2) danger to her life therefrom.

██ We have frequently held life may be endangered by impairment of health. Also that life may be endangered where such danger is reasonably to be apprehended. We have repeatedly held conduct of one spouse may amount to such inhuman treatment as to endanger life even without physical violence or mistreatment. Howe v. Howe, 255 Iowa 280, 282, 122 N.W.2d 348, 349, and citations, and McMurray v. McMurray, 256 Iowa 97, 99, 126 N.W.2d 336, 338, and citations, support these rules.

Any mistreatment which deprives a spouse of needed rest, peace of mind and affects the nervous system so health is undermined may endanger life as effectively as physical violence. Cimijotti v. Cimijotti, 255 Iowa 77, 79, 121 N.W.2d 537, 538, and citations; Hancock v. Hancock, 257 Iowa 119, 123, 131 N.W.2d 757, 760.

■ One principle that finds application here is that conduct of one spouse toward another person of the opposite sex, even without adultery, may amount to such inhuman treatment as to afford cause for divorce. Rasmussen v. Rasmussen, 252 Iowa 414, 420, 107 N.W.2d 114, 117, 118, and citations; Lane v. Lane, 253 Iowa 92, 95, 111 N.W.2d 286, 288.

■ Code section 598.7 provides "No divorce shall be granted on the testimony of the plaintiff alone." Corroboration is required to prevent collusion between the parties. It is not necessary, however, that every detail of plaintiff's testimony be corroborated or that the corroboration alone sustain the decree. Also defendant's testimony may corroborate plaintiff's. Payton v. Payton, 252 Iowa 772, 776, 108 N.W.2d 358, 360, 86 A. L. R.2d 416, and citations; Lane v. Lane, supra, at pages 95, 96 of 253 Iowa, page 288 of 111 N.W.2d. See also Hancock v. Hancock, supra, 257 Iowa 119, 123, 131 N.W.2d 757, 760, and citations.

III. When married in May 1935 plaintiff was 17, defendant 19. He had dropped out of school in the seventh grade to help his father farm. Not long after the marriage defendant went to work for a truck gardener for $9 a week, a shed to house the couple and some vegetables to eat. In 1936 defendant again worked on a farm. He took a 13-weeks high school night course in machine shop practices while working days in such a shop in Omaha. This was followed by ten years' work at Stengles' machine shop in Council Bluffs, starting with 70 hours a week as an apprentice. The last five years he was shop foreman and did outside work of his own at night, caring for racing autos, repairing washing machines and sharpening lawnmowers.

At Thanksgiving time, 1951, a physician advised defendant he was working too hard and must give up either his job at Stengles or the outside work of his own. He quit his regular job and devoted full time to the shop he had set up in the rear of the family dwelling in Council Bluffs. Four or five years later defendant moved his shop to a building on Broadway which, with two additions subsequently built, now houses Arnold Tool & Die Works, Inc., with 22 employees. The business was incorporated July 1, 1959.

Plaintiff encouraged defendant to go into business for him-

self and helped him in it part time for four to five years following inception of the venture. She kept books on Fridays, helped with deliveries and other work, a total of about two days a week. After the shop was moved to Broadway a full-time bookkeeper was employed and plaintiff stopped helping in 1956. During at least part of the period plaintiff assisted in the business, outside help was procured for the home.

Unfortunately the parties' married life has not succeeded as the Arnold business has. Defendant lost his love and affection for plaintiff and such attention as was not devoted to his shop was largely centered on another woman, married but separated from her husband. Her first name was Dorothy. Commencing in February 1962 defendant frequently kept very late hours with this lady friend. The first time this came to plaintiff's personal knowledge defendant said he had been out having fun and called her attention to the lipstick on his mouth. Defendant and Dorothy drank and kissed each other in taverns and so-called clubs and his Cadillac was seen several times at different hours of the night parked near her apartment. It was not unusual for defendant to be gone from home all night and much of the following day, refusing to tell plaintiff what he had been doing.

In March plaintiff and defendant returned home from a dinner-dance at 4:30 a.m., the defendant said he had another appointment, insisted on leaving and threatened to knock plaintiff across the drive if she did not get out of the car. On their wedding anniversary in May (1962)—also Mother's Day—defendant told plaintiff he did not love her anymore, wanted a divorce, and loved another woman he wanted to marry. In July, August and September (the petition was filed September 27) defendant was gone from home much of the time, was cold and distant toward plaintiff and seldom saw the children.

Frequently when defendant came home at a late hour he had been drinking, many times heavily and sometimes intoxicated. Defendant admits he has drunk since he was 17. Plaintiff does not like to drink and does so sparingly. Defendant's addiction to liquor and plaintiff's dislike of it have caused a good deal of their trouble, although less than has his affinity for Dorothy.

Defendant does not deny any of the testimony for plain-

tiff as to his conduct with Dorothy. When plaintiff's counsel tried to cross-examine him regarding it, the court ruled it was not proper cross-examination. Defendant sought in direct examination to leave the impression his late hours were spent working and entertaining business customers. Doubtless this did account for some, but by no means all, of his staying out late. We think the attempted cross-examination was proper. We may observe the trial court ruled on all objections to evidence as if the trial were at law, contrary to the accepted procedure in equity cases. However, plaintiff does not assign or argue this as a proposition relied on for reversal and we give the point no more consideration.

Further details of plaintiff's case, as to her right to a divorce, need not be stated although this long record contains much more. As before indicated, we think plaintiff has proven such inhuman treatment as to endanger her health, disturb her peace of mind, undermine her nerves and hence endanger her life. See in support of this conclusion Hawkins v. Hawkins, 250 Iowa 233, 237, 93 N.W.2d 584, 586, and citations; Annotation, 157 A. L. R. 631, 636 to 641.

Defendant's claim the doctrine of recrimination should be applied rests in part on testimony that plaintiff called him a "s.o.b." and a stupid bastard, at least sometimes in the presence of the children. Plaintiff admits she used the former term at times, perhaps in the presence of the oldest son, but denies the rest of such testimony. There is also evidence that once when defendant returned home late at night plaintiff obtained a large knife and said she should use it on defendant. He took the knife away from her, struck her with it two or more times and administered other punishment to her. There is also testimony plaintiff threatened defendant with a skillet on one occasion. At all these times plaintiff had reason to be much provoked and was distraught at defendant's conduct.

One sufficient reason the doctrine of recrimination is not applicable is that plaintiff's misconduct did not, so far as shown, endanger defendant's life. It is evident he can and does withstand punishment much more readily than plaintiff. Indeed until now defendant has been able to work hard all day and stay out

much of the night with no apparent ill effects. On the issue of recrimination the case is somewhat like Phillips v. Phillips, supra, 251 Iowa 1310, 1317, 1318, 104 N.W.2d 832, 836, and Bartels v. Bartels, supra, 246 Iowa 942, 955, 69 N.W.2d 41, 47.

We think plaintiff's evidence of inhuman treatment is sufficiently corroborated, especially by her witness Mrs. Lewis, and by defendant's own testimony.

IV. At the time of trial plaintiff and defendant jointly owned their home subject to a mortgage of $2783. It had been remodeled five or six years previously at a cost of $7500 to $8000 and some of the labor was donated by defendant's brother. After the shop was moved from the garage it was remodeled into a recreation room and a one-stall garage. The trial court found the value of the home and garage was $20,000; the household goods, furniture and appliances were reasonably worth $3500 (new furniture and appliances were purchased at the time the dwelling was remodeled), and the 1959 station wagon was worth $1600.

Much the largest pecuniary asset of defendant was his stock in the Arnold Tool & Die Works, Inc., of which, as stated, he was sole owner. The court found the corporation's net worth on December 31, 1962, was $182,468.62 but that federal and state income taxes reduced this $26,455.37 to $156,013.25. However, $10,729.94 of corporate liabilities was owed to defendant. Thus the court found his net worth, apart from his interest in the home, its contents and the station wagon, was $166,743.19. The court concluded plaintiff was entitled to approximately one third of this amount or $55,550.

Of this last sum $12,550 was ordered paid to her by transfer of defendant's half interest in the home, its contents and the station wagon. Defendant was ordered to pay the mortgage on the home and any indebtedness on the personalty (there was about $350 unpaid on a new television-stereo set); $1000 cash was to be paid plaintiff forthwith. The remaining $42,000, with interest at five percent, was to be paid her in amortized monthly payments of $332.14 over a period of 15 years. These payments were to be secured by the pledge of one third the stock of the Arnold corporation. (Total amount plaintiff would receive from

these monthly payments is $59,785.20.) These payments survive the death of either party and are unaffected by marriage of plaintiff.

Defendant was also ordered to pay plaintiff for support of the three minor children $180 per month, to be reduced by $60 whenever any child became 21, self-supporting or emancipated or was married.

Defendant was ordered to pay forthwith $3500 as fees to plaintiff's attorney and $500 court costs and costs of suit incurred by plaintiff. She employed an investigator to watch defendant and an unlicensed accountant to examine books and records of the Arnold corporation. Both were witnesses. Pursuant to application to this court after the appeals were taken we allowed plaintiff's counsel $750 additional fees for services in connection with the appeals, final order to be made when they were decided.

We may observe that the parties stipulated the monthly payments of $180 child support and $332.14 on property division should be made and received during pendency of the appeals, without prejudice to the rights of either party. Presumably these amounts have been paid.

Plaintiff argues the court's findings as to defendant's net worth are in error and the decree does not award plaintiff sufficient property and permanent alimony. It is argued plaintiff was entitled to at least half of all the property; the net worth of the corporation was much greater than the court's findings indicate because in part, it is said, a large amount should have been added for goodwill of the business; the amount allowed for child support is too low and the property settlement should not have been spread over a period of 15 years.

We cannot agree plaintiff is entitled to at least half the property, including the net worth of the corporation. The decree recognizes her ownership of half the home, its contents and the station wagon, all acquired with defendant's earnings. It is true some of our decisions have approved an award to the wife of as much as half the joint accumulations of herself and husband. Generally where it is done the accumulated property is the product of the joint efforts of both spouses over a considerable period. This is not such a case.

The property here was accumulated by defendant's efforts with limited part-time help from plaintiff for a period not exceeding five years. The trial court held it cannot be found the success of the business was in any respect due to plaintiff's efforts. Although we are not bound by the court's findings, we give weight to them. See rule 344(f)7, Rules of Civil Procedure.

■ Further, there is no definite rule as to what portion of the joint accumulations should be awarded the wife in a particular case. Rider v. Rider, 251 Iowa 1388, 1391, 105 N.W.2d 508, 510. Certainly there is no rule that such portion should be at least half. Code section 598.14 provides, "When a divorce is decreed, the court may make such order in relation to the children, property, parties, and the maintenance of the parties as shall be right." Several of our opinions have listed a number of facts to be considered, along with others, in reaching a just and equitable decision upon these matters. Pfab v. Pfab, 257 Iowa 303, 305, 132 N.W.2d 483, 484, and citations; Blaney v. Blaney, 256 Iowa 1151, 1153, 130 N.W.2d 732, 733; Weiland v. Weiland, 255 Iowa 477, 480, 122 N.W.2d 837, 839, and citations.

■ However, these decisions add little to the quoted statute. Weiland and Blaney cases, supra; Rasmussen v. Rasmussen, supra, 252 Iowa 414, 423, 107 N.W.2d 114, 119. We have frequently pointed out that in determining what is "right" in property division and related matters no two cases are exactly alike on their facts and precedents are of little value. Hancock v. Hancock, supra, 257 Iowa 119, 124, 131 N.W.2d 757, 760; Howe v. Howe, supra, 255 Iowa 280, 282, 122 N.W.2d 348, 349. A just determination of such issues is peculiarly dependent upon the facts of the case. Pfab v. Pfab and Blaney v. Blaney, both supra; Rider v. Rider, supra, 251 Iowa 1388, 1390, 105 N.W.2d 508, 510, and citations.

■ We are not persuaded the trial court's finding as to the net worth of the corporation was much too low, as plaintiff argues. The amount found by the court was taken from the balance sheet of assets and liabilities attached to the corporation's 1962 income tax return which plaintiff offered in evidence. The statement was prepared by the man who had been the corporation's accountant from the time of incorporation. However, the

court reduced the amount stated in that balance sheet by $26,-455.37 because of state and federal income taxes for 1962. Plaintiff's complaint this reduction was improper cannot be accepted.

The trial was concluded December 26, 1962, except for further testimony on the net worth of the corporation and related matters on January 11 and a hearing in chambers on July 10, 1963, when plaintiff offered in evidence the corporate income tax return, including the balance sheet above referred to. The income taxes for 1962 were not finally determined or paid until after the main trial. But the corporation's accountant included in another balance sheet prepared by him as of December 31, 1962, income taxes for the year estimated at $26,326.18, about $129 less than the sum the court deducted as the taxes finally computed.

We think it was proper and in accordance with usual accounting practices to include in the balance sheet as of December 31, 1962, the income taxes for the year then ending. Not to do so would not fairly reflect the corporation's net worth. As said in Aron v. Gillman, 309 N. Y. 157, 163, 128 N.E.2d 284, 288, 51 A. L. R.2d 598, 603: "* * * a complete ignoring of the income taxes until actually payable, would mean an arbitrary, capricious and widely fluctuating purchase price, depending on the time of the last audit. * * * Such a result is manifestly unreasonable from both a practical and theoretical point of view.

"Clearly it makes no sense to charge the entire year's burden of income taxes to the income of the last month preceding termination of the taxable year. On the contrary, sound accounting practice requires that each dollar of income as it is earned throughout the year should bear its proportionate share of the costs of the enterprise, including the tax burden [citations]. For this reason interim audits made during the taxable year should include an estimate of the income taxes applicable to the period in question. The mere fact that an item is not yet legally due and payable does not mean that it may be ignored as a liability [citations], nor does it mean that the item may not be included in a computation of book value [citations]."

See also section 11, pages 619 to 621, of the annotation to the above opinion, which states (page 620), "* * * courts have

shown a tendency to charge against the book value of stock the amount of taxes that had accrued as of the valuation date, irrespective of when payment might be due * * *." See also Woodward v. Quigley, 257 Iowa 1077, 133 N.W.2d 38, 45, 46.

We feel it was also proper to accept the amount of depreciation of buildings and other depreciable assets shown on the corporation's tax return for 1962 which plaintiff placed in evidence.

Nor are we persuaded a large sum should have been added to the corporation's net worth as goodwill of the business. We may accept the statement in plaintiff's brief that the presence and value of good will rest largely upon the excess of net earnings over a fair return on the net tangible assets. However, a number of other factors are also to be considered. We find no evidence of the value of this corporation's goodwill by application of the above formula.

The corporation was formed three and one-half years before the trial because of defendant's income tax problems and inability as an individual to obtain financing. Corporate life is thus of short duration. Its work is not diversified but highly specialized, making tools and dies to order. Eighty-six percent of its business comes from a single customer and it is required to bid for contracts in competition with two other makers. It has no brand name nor are its products offered to the public. The corporation is dependent on the services of defendant. He testified he would not know where a man could be gotten to replace him. So in a practical sense, to attribute goodwill to the corporation is to attribute goodwill to defendant.

We are content with the amount allowed for child support of $180 per month. "These boys should have such support from their father as their needs, rather than their wants, require." Chase v. Chase, 255 Iowa 686, 690, 124 N.W.2d 168, 170. It is possible plaintiff and the children will find it necessary to be less extravagant than in the past. The court found plaintiff has overindulged the children in clothes, sporting equipment, gifts and nonessentials and is unmindful of reasonably good economy. There is undisputed evidence the children have charge accounts at both a grocery and drugstore. If the amount of

child support discourages extravagance in plaintiff and the children, it will have served a desirable purpose.

Plaintiff thinks she should receive her share of the property now and not be paid the value of much of it ($42,000) in monthly installments over a period of 15 years. It seems probable the trial court concluded it would be best *for plaintiff* not to receive her share of the property or its value all at once but to have it spread over a period of years with interest at five percent, adequately secured by a pledge of corporate stock. It is true this will impose some tax liability upon plaintiff but her tax burden with herself and three dependents will not be heavy and the tax saving to defendant will be substantial. We are not satisfied the provisions of the decree for monthly payments are unwise.

Until about July 1, 1962, defendant deposited $750 a month in what was to be a joint bank account for both plaintiff and himself to draw on. However, defendant wrote very few checks on this account, he says because plaintiff spent it all. In any event plaintiff checked out virtually all the account. She admits she saved none of it. About July 1, 1962, these monthly deposits were reduced to $500.

V. We see only one respect in which we think plaintiff is entitled to substantial relief the decree does not give her. Unless the standard of living to which plaintiff and the children are accustomed is to be largely reduced, in excess of desirable economies to which we have alluded, plaintiff will be required by the decree to exhaust the monthly installments of $332.14 and the child support of $180 for taxes, insurance and upkeep of the home, food, clothing and other living expenses. When the installments and child support are all paid plaintiff will be reduced to the home and its contents. Defendant, however, according to present prospects should have most of his share of the property intact.

It is to be expected much of the child support will be spent as it is received but plaintiff should not be compelled to exhaust her share of the property, except the home and its contents, for family expenses at least until such time, if ever, as she remarries. We think plaintiff should receive monthly pay-

ments of alimony in addition to what the decree gives her. We fix these payments at $250 per month commencing April 1, 1965, until such time, if ever, as plaintiff remarries, the payments to terminate at the death of either plaintiff or defendant. Perhaps $430 a month will not defray all the family expense and upkeep of the home but it should enable plaintiff to invest at least part of the monthly payments of $332.14 for which the decree provides. The twins are now 15 and should be able to earn all or part of their spending money.

The decree required defendant to pay the first installment of taxes for 1962 on the home and plaintiff to pay the second installment. We think defendant should also have been required to pay the second installment. If plaintiff has paid it defendant should reimburse her therefor.

VI. As stated, the decree required defendant to pay $3500 as fees to plaintiff's attorney and $500 for court costs and "to defray costs of suit incurred by plaintiff and her counsel." Presumably this refers to the cost of the private investigator and the accountant employed by plaintiff. Defendant's cross-appeal challenges the allowance of attorney fees as excessive. Although the amount seems large we are not persuaded it is excessive so as to warrant reduction by us.

Also, as stated, we allowed $750 additional fees to plaintiff's attorney for services in connection with the appeals, final order to be made when they are decided. We now allow $250 more for services of plaintiff's attorney on the appeals. When the case is concluded it will have been nearly two and one-half years since the action was commenced in district court. The record on appeal contains 360 pages aside from many exhibits. Plaintiff's brief contains 110 pages. Able counsel have represented defendant throughout. The case has been well prepared and presented by both sides both in the trial court and here. Some questions raised are seldom presented in divorce cases.

VII. We do not know the amount of court costs in the district court and so do not know how much of the $500 defendant was ordered to pay is available "to defray costs of suit incurred by plaintiff and her counsel." Plaintiff paid the private investigator $210, doubtless from money deposited by defendant

in the joint account above referred to. She had no other money. We do not think defendant should be compelled to restore this sum to plaintiff and thus, in effect, pay it twice. According to plaintiff's testimony she may owe the investigator up to $200 more. We require defendant to pay any unpaid reasonable charge of the investigator not exceeding $200.

Plaintiff incurred a bill of $225 for services of her accountant, at $10 an hour, to the conclusion of the trial in district court. There is evidence the charge is reasonable. We require defendant to pay this. The amount defendant is to pay under this and the preceding paragraph is to be reduced by any excess of the $500 he was ordered to pay, if paid by him, over the court costs in the district court. See in connection with the allowance of expense for the investigator and accountant Rutherford v. Rutherford, 230 Iowa 298, 303, 304, 297 N.W. 259, 261; Riemenschneider v. Riemenschneider, 239 Iowa 617, 621, 622, 30 N.W.2d 769, 771.

Costs of this appeal are to be taxed to defendant.—Modified, affirmed and remanded on plaintiff's appeal; affirmed on defendant's cross-appeal.

All JUSTICES concur.